## W. R. GAINES v. THE STATE.

No. 1598.   Decided October 20, 1897.

**1. Change of Venue—Bill of Exceptions and Judge's Explanation.**

Where a bill of exceptions was reserved to the overruling of defendant's motion for change of venue—which motion was based upon the supposed bias and prejudice of the judge—an explanation made by the judge to said bill can not be used as evidence to support or disprove the allegations contained in the motion, or the affidavits appended thereto, said explanation not being sworn to by the judge.

**2. Same—Prejudice of the Judge.**

Our statute enumerates the grounds for a change of venue, and the prejudice of the trial judge is not one of the enumerated grounds.

**3. Setting a Day for the Trial of a Capital Case.**

Article 646 of the Code of Criminal Procedure authorizes the court, in its discretion, to set any day of the term for the trial of a capital case. This article is controlling upon the subject, and under its authority the day set may be a day during the term prior to the day set for taking up the criminal docket.

**4. Murder—Evidence—Cross-examination of the Wife as a Witness.**

On a trial for murder, where the wife of defendant is a witness for him, her cross-examination must be limited strictly to matters which are pertinent and germane to matters drawn out in her examination in chief. It is error to permit her to be cross-examined over objection as to important collateral independent matters injurious to defendant, and the error is intensified by permitting her, after such illegal cross-examination, to be impeached by proof of her contradictory statements as to such matters.

**5. Same—Acts, Conduct, and Declarations, and Impeachment of the Witness.**

On a trial for murder, where the State was, over objections, permitted, on cross-examination of the wife, to elicit from her the fact that, on the evening before the homicide, she went over to her brother's (the deceased) and warned him not to come to town the next day, and also to prove her exclamations at the time she reached the dead body of her brother; Held, this evidence of her acts and conduct was inadmissible, as it simply tended to establish apprehension on the part of the witness, and did not tend to show any act or demonstration of defendant. The acts and conduct of a witness are never pertinent as evidence against a defendant, and are only admissible when legally used for the purpose of impeaching the witness. A witness can not be impeached by illegal testimony.

**6. Same—Charge of the Court.**

Evidence, such as that indicated in the foregoing paragraph, being clearly inadmissible for any purpose, it is beyond the power of the court to so limit and control it in the charge as to deprive it of its injurious effect, and especially so when such evidence tended to suggest express malice on the part of the defendant, and might have influenced the jury in determining the degree of murder.

**7. Same—Evidence—Threats—Animus of Defendant.**

On a trial for murder, where threats have been proved on the part of defendant towards deceased, it was legitimate for defendant to prove, in rebuttal of his animosity, that he had, before the homicide, talked with a witness about his difficulties with deceased and that he had proposed to drop them.

**8. Evidence in Rebuttal.**

On a trial for murder, where defendant had shown that deceased had armed himself after reaching town on the day of the homicide, it was competent for the State to show that deceased had armed himself on account of an anticipated difficulty with a third party.

**9. Evidence—Declarations of Defendant.**

Abstract declarations and exclamations of the defendant shortly before the homicide, made in an excited manner, and to the effect, "I am going to wind it up;" "I am going to wind it up—I've had enough of it;" were immaterial and irrelevant unless shown to be, in some manner, connected with or to have had reference to, the homicide.

APPEAL from the District Court of Grayson. Tried below before Hon. DON A. BLISS.

Appeal from a conviction for murder in the first degree, the penalty assessed being a life imprisonment in the penitentiary.

Defendant and the deceased were brothers-in-law, defendant having married deceased's sister. The parties had been at enmity for some time prior to the killing; deceased claiming that defendant had maltreated his sister, and in consequence of which he had time and again persuaded her to leave her husband. It is also in evidence that deceased had killed a brother of defendant. Some time prior to the killing involved in this prosecution, Charles Koch, the deceased, went to defendant's house, and, calling his sister out to the gate, endeavored to get her to promise to leave her husband, the defendant. After this conversation with his sister, as he was walking off leading his horse, defendant emerged from his house with his Winchester gun in his hand, and fired one or more shots at him. This caused defendant to be indicted for an assault with intent to murder deceased, and the case for assault with intent to murder was set for trial in the District Court at Sherman on the day of the homicide, and was the occasion of the parties being in the city on that day. The facts attendant upon the killing will be found so fully stated in the opinion below that it is unnecessary to make any additional statement.

Defendant applied to the trial judge to change the venue, upon the ground that the matters and things set up in his application showed such prejudice and prejudgment of his case by the judge as that he could not give defendant a fair and impartial trial. The opinion below sets out this matter so fully that it needs no further statement to make it clearly understood.

The same may be said of the testimony on cross-examination of Mrs. Gaines, the wife of defendant, introduced and examined by him as a witness. Her cross-examination, in so far as it was objected to, will be found stated in the opinion.

*Hazlewood & Smith, P. B. Muse, J. D. Woods, I. M. Standifer,* and *M. H. Garnett,* for appellant.—Article 3, section 45, of the Constitution provides that the power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law; and the Legislature shall pass laws for that purpose.

Article 576, Code of Criminal Procedure, provides that the judge may change the venue in any case of felony, if he is satisfied from any cause a trial, alike fair to the accused and the State, can not be had.

This discretion given the judge in determining upon the merits of the application is a judicial and not a personal discretion. Walker v. State, 42 Texas, 376; Dupree v. State, 2 Texas Crim. App., 617. The refusal of the application by the court and its action thereon will be revised upon appeal if it appear that such discretion was abused to the prejudice of the defendant. Bohannon v. State, 14 Texas Crim. App., 302; Martin v. State, 21 Texas Crim. App., 10; Lacy v. State, 30 Texas Crim. App., 128.

The Court of Appeals of this State, in the case of Steagald v. State, says: "If the facts surrounding the prisoner were such as are detailed as having taken place before the trial, and those facts were, as charged, known to the judge, and he had good reason to believe or was satisfied from said facts that a trial alike fair and impartial to the accused and to the State could not be had in the county, he should upon his own motion have ordered a change of venue," etc.

It is further said: "At all events, if information of such facts and circumstances as are stated was brought to the knowledge of the judge by the attorneys whom he had appointed to defend, and who were officers of his court, and who stated good and sufficient reason why defendant was unable to make the statutory motion himself, it was his duty, at least, to inquire into the matter and hear testimony in order that he might know what his duties were in the premises, and act upon it accordingly." 22 Texas Crim. App., 495.

In said case the court further says: "Among English speaking peoples 'the right of trial by jury' has always been considered, and Sir William Blackstone justly denominates it 'the palladium of civil rights.' Our Constitution requires that it 'shall remain inviolate.' Bill of Rights, sec. 15.

"As an essential factor in the protection of the life and liberty of the citizen, it is considered so important that our laws declare that 'the defendant to a criminal prosecution for any offense may waive any right secured to him by law except the right of a trial by a jury in a felony case.' Code Crim. Proc., art. 23. But he is not only entitled to a trial by jury, but our Constitution characterizes the kind of jury which is to try him, and says: 'The accused shall have a speedy public trial by an impartial jury.' Bill of Rights, sec. 10. Not only so, but it is also the will and policy of the law that the 'trial shall be alike fair and impartial to the accused and the State.' An impartial jury and a fair trial is what the State demands, and in her demands she is no respecter of persons. She has one law for all—the high and the low, the rich and the poor, the friendless, the most debased and hardened of criminals; the greater and more horrible the crime charged, the greater and more imperative the necessity that these safeguards—these landmarks of the law—should be constantly looked to and kept steadily in view, lest perchance they should be forgotten, denied, or ignored in those natural promptings of a manly, it may be, and certainly human instinct, which, standing appalled and outraged at the very contemplation of such heinous iniquity, condemned the suspected criminal in advance, and mainly

perhaps through the magnitude and turpitude of his imputed crime. In such cases, when the popular mind is inflamed and popular indignation is ready and clamorous to become the executioner of its own vengeance, it is the part of an honest, fearless, manly judiciary to uphold the standing of the law, and to vindicate its majesty and integrity regardless of all consequences." 22 Texas Crim. App., 496.

The court says in the case of Oakley v. Aspinwall, 3 New York, 549: "The first idea in the administration of justice is that a judge must necessarily be free from all bias and partiality. He can not be both judge and party, arbiter and advocate, in the same cause. Mankind are so agreed in this principle that any departure from it shocks their common sense and sentiment of justice.  *  *  *  Partiality and bias are presumed from the relationship or consanguinity of a judge to the party." Where the bias of a judge is shown to exist from the evidence, why should not the same rule apply?

The Constitution of New Hampshire provides: "It is the right of any citizen to be tried by judges as impartial as the lot of humanity will admit;" and the Supreme Court of that State, in Moses v. Julian, 45 New Hampshire, 52, commenting upon this provision, says: "This is but the expression of the well known rule of universal justice, everywhere recognized, which the people of this State were anxious to secure as far as possible from all doubts, or possibility of legislative interference. It is one of the great principles of the common law, for which the people of England had struggled for ages, and which they ultimately succeeded in establishing against the strenuous efforts of a tyranical government. We can have no higher authority than this for denouncing as illegal everything which interferes with the entire impartiality of every legal tribunal."

We challenge the closest scrutiny of this entire record and of the qualification appended by the judge to the bill of exceptions (which facts, stated by him, if true, should have been sworn to), and defy the impartial mind to come to any conclusion other than the one that Judge Bliss made the indiscreet and indecorous remarks attributed to him, "That the defendant was guilty of a cowardly assassination, and the scoundrel ought to be hung," indiscriminately to the people of his county.

In reference to the setting of this case two weeks in advance of the criminal docket, we submit the following proposition, to wit:

When the court has made its order fixing the day for taking up the criminal docket, it is erroneous to set any particular criminal case in advance of such time. Code Crim. Proc., art. 601.

The order was made setting the criminal docket for November 11, 1895. The court made an order setting this case down for trial October 28, 1895. The defendant duly excepted to such action of the court. The defendant's first application for a continuance was overrruled, and he was compelled to go to trial on the morning of October 29, 1895. The first ground of the motion for a new trial was predicated upon this erroneous ruling of the court.

In reference to overruling defendant's first application for a continuance, we submit the following propositions:

1. The testimony of the absent witness, Sam Whitaker, was shown to be material; the witness was shown to have been sick before the trial begun and physically unable to attend the same at any time during its progress, the application showing that due diligence had been used to procure his attendance. The court abused its discretion in overruling the same, and committed error to the defendant's prejudice.

2. Where it is shown in a first application for a continuance that a witness is absolutely unable and incapacitated to attend a trial by reason of sickness, and resides in the county of the trial, and a sufficient excuse is shown why he was not served with process to procure his attendance, and it is shown that no amount of diligence would have secured his attendance, the court in the exercise of the sound discretion given by law will set over the case or grant continuance to procure such testimony. Maples v. State, 14 Texas Crim. App., 135; Phillips v. State, 35 Texas Crim. Rep., 480.

3. The testimony of the witness for whom a continuance was asked was, when viewed in the light of the testimony adduced upon the trial, shown to have been material and probably true and of such a character as might change the result, the witness being shown to have resided within sixteen miles of the court and in the county in which the trial was had, and was shown to have been sick before the case was called, and sick during the progress of the case and physically unable to attend the trial at any time during its progress. The court should have granted the defendant's motion for a new trial even though defendant had not used sufficient diligence to have procured his attendance in the first instance. Simmons v. State, 26 Texas Crim. App., 532; Cordway v. State, 25 Texas Crim. App., 418; Jackson v. State, 23 Texas Crim. App., 183; Covey v. State, 23 Texas Crim. App., 388; Richardson v. State, 28 Texas Crim. App., 218; McAdams v. State, 24 Texas Crim. App., 86; Irvine v. State, 20 Texas Crim. App., 40.

In reference to the cross-examination of the defendant's wife, Mrs. Lula B. Gaines, we submit the following propositions:

1. That the questions propounded were irrelevant, immaterial, and hearsay.

2. It was permitting the State in each instance to cross-examine the witness upon matters about which she had not testified on her examination in chief.

3. The cross-examination of the wife must be strictly confined to matters about which she has testified in her examination in chief. Johnson v. State, 28 Texas Crim. App., 25; Bluman v. State, 33 Texas Crim. Rep., 64; Washington v. State, 17 Texas Crim. App., 203; Hoover v. State, 35 Texas Crim. Rep., 342; Creamer v. State, 34 Texas, 176.

4. The testimony sought to be elicited by the cross-examination of Mrs. Gaines did not spring out of and was not germane to her examination in chief; it was original evidence and was permitting the State to

make the wife a witness against her husband. Willson's Crim. Stats., secs. 2442, 2443; Bluman v. State, 33 Texas Crim. Rep., 64; Hoover v. State, 35 Texas Crim. Rep., 342; Washington v. State, 17 Texas Crim. App., 203.

5. In several instances the testimony so elicited was purely the opinion of the wife.

6. The remarks made by the court in the hearing and presence of the jury in commenting upon the evidence as set out in bill of exceptions number 13, pages 242, 243, and in bill of exceptions number 20, pages 261, 262, were each unwarranted by the law, were prejudicial to the defendant, and were comments upon the evidence by the judge in the hearing of the jury, and were argumentative in favor of the State. Code Crim. Proc., arts., 677, 678, 729; Kirk v. State, 35 Texas Crim. Rep., 224; Kelley v. State, 33 Texas Crim. Rep., 33; Lawson v. State (Texas Crim. App.), 32 S. W. Rep., 895; Crook v. State, 27 Texas Crim. App., 241; Reason v. State (Texas Crim. App.), 30 S. W. Rep., 781.

We challenge the closest scrutiny of this entire record, and assert that the facts proven by the State upon a cross-examination of the wife of defendant did not spring out of and were not germane to the examination in chief. That it was original evidence, and of a most damaging and material character to the defendant. Bluman v. State, 33 Texas Crim. Rep., 64; Washington v. State, 17 Texas Crim. App., 204.

1. These statements were about matters which the witness, being the wife of the defendant, could not be cross-examined upon, as they were not germane to and did not spring out of any fact elicited by the witness on her direct examination.

2. The alleged statements were made in the absence of the defendant, and were, if ever made, purely opinions or presentiments on her part, and being such, and also being immaterial matters, the State was bound by the answers given and could not contradict her. Davis v. State (Texas Crim. App.), 20 S. W. Rep., 923; Johnson v. State, 22 Texas Crim. App., 223; Brite v. State, 10 Texas Crim. App., 368; Drake v. State, 29 Texas Crim. App., 270; Johnson v. State, 27 Texas Crim. App., 174; Whart. on Crim. Ev., sec. 484.

3. As this witness could not have legally testified to such fact, being the wife of the defendant, and the same not being in response to anything called out by defendant, it was illegal to cross-examine the witness upon such matters, and even though the same were matters that were material to the State's case, this witness could not be contradicted on her answers made in reference thereto.

4. These matters were all hearsay as to the defendant, were incompetent, and irrelevant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal. A number of bills of exception are presented, on which a reversal is asked. Only such as are deemed important will be discussed.

1. Appellant's first bill of exceptions brings in review the action of the district judge who tried this cause in refusing to grant a change of venue. The change of venue in this case was asked on the ground of prejudice on the part of the judge. To present this matter fully, the motion to change the venue, as contained in the bill of exceptions, will be set out: "(1) Now comes the defendant, William Gaines, and would represent and show to the court that he can not have a fair and impartial trial in this court, and before the judge who presides over the court, for the reasons: That soon after the deceased, Charles Koch, was killed, on the same day thereof, and a few minutes after such killing, the presiding judge of this court, the Honorable Don A. Bliss, the Judge of the Fifteenth Judicial District, in the courtroom of this (Grayson) county, in the presence and hearing of a large number of people, while this court was in sesssion and engaged in the trial of a case, but while the trial of such case was temporarily suspended on account of the excitement created by such killing, in a nervous, excited manner, stated that the defendant was guilty of a cold-blooded, cowardly assassination, by reasoᴜ of such killing, and that defendant ought to be hung for such killing. And the said Bliss, judge aforesaid, also stated at such time that he intended to put defendant on trial at once for said homicide. That said judge also then and there stated that he intended to reassemble the grand jury of this (Grayson) county, and have defendant indicted for such homicide. That such declarations and statements as aforesaid were made at the last term of the court, and on and about the 8th day of July, 1895. That the said judge did cause the grand jury of Grayson County to be reassembled, and that said grand jury had been discharged that term. That upon the reassembling of the grand jury the said Honorable Don A. Bliss, instructing the said grand jury as to their duties, and in commenting on the homicide for which the defendant stands indicted, used the following language, to wit: 'Gentlemen of the grand jury: Since you were discharged there has been an occurrence which appears to me to have been a cowardly assassination. It will be your duty to thoroughly investigate this occurrence, and you have been reassembled for that purpose. If, after thorough investigation, you believe that a murder has been committed, it will be your duty to find a bill charging the guilty party with the offense. Whether a petit jury sustain this charge by their verdict is something with which you and I have nothing to do. All we can do is to do our duty, and leave the responsibility where it belongs. On the other hand, if, after investigation, you should believe that the killing was justifiable under the law, it will not be your duty to find any bill at all.' The last remarks above quoted were made by the said Honorable Don A. Bliss while this defendant was on trial, charged with assault to

murder said Charles Koch, but during the impaneling of said grand jury, and the utterance of said remarks by said Bliss, the jury were removed from the courtroom. On the 12th of July, 1895, the said Honorable Don A. Bliss had an interview with a reporter of the Sherman Daily Register, a newspaper of general circulation in the city of Sherman and county of Grayson. That such interview was published in said paper, and also in the Sherman Courier, a newspaper published in Sherman, Grayson County, Texas, and of wide circulation throughout said county, and such interview was also published in the Dallas Daily News, a paper which has a large circulation in Grayson County and throughout the State of Texas, which interview, and what the said reporter said in regard thereto, is as follows: (2) 'What Judge Bliss Said About the Killing by Gaines Last Tuesday.' (3) There has been more or less talk on the streets to-day about the report that Judge Bliss, before whom the Gaines Case is to be tried, had expressed himself on the killing. Judge Bliss stated to a reporter this evening: (4) "I made the remark attributed to me. It was this way: It was during a recess of the court, when an eyewitness, in whom I have confidence, told me of the killing, and the circumstances of it. I remarked that, if such was the case, Gaines was a cowardly assassin, and deserved to be hung." ' (5) The defendant would represent that the aforesaid statements of the reporter and of the said Honorable Don A. Bliss have been published as aforesaid, and that your honor has never disavowed or corrected the same in any manner. He would also represent that such remarks and interviews had direct reference to the homicide for which defendant stands indicted in this case. (6) Defendant would also represent that your honor has not only failed to disavow or correct such remarks and interviews, but that he has been informed and believes, and here now charges the fact to be, that your honor has frequently, and to different persons, on the streets of Sherman and elsewhere, substantially reiterated such interviews. (7) Defendant also represents to your honor that the remarks of your honor hereinbefore stated, and hereinafter to be mentioned, concerning the defendant's case, and your honor's attitude towards this defendant in this case, are commonly, generally, and notoriously known through the limits of Grayson County, and the defendant is greatly prejudiced thereby. (8) The defendant would also represent that while he was about to be placed on trial, and after his motion for a continuance had been read to your honor in the case of the State of Texas v. the defendant, wherein he was charged with an assault to murder Charles Koch, your honor stated at the conclusion of the reading of said application for continuance, to the parties present in the courtroom engaged in the said case, 'Wait a minute;' that you then vacated the bench, left the courtroom, went to the telephone office in the city of Sherman, put yourself in telephone connection with someone at Van Alstyne, who is unknown to defendant; that you then had a conversation over the telephone with said unknown person, which conversation is also unknown to the defendant; that you then, within a

few minutes, returned to the courtroom and stated that you overruled the application for a continuance; that at such time your honor stated that you had telephoned to some one at Van Alstyne, but the name of the person or persons was not given, neither did you state what the conversation was; that on the preceding evening said motion for a continuance was conceded by counsel for the State, that said application for continuance was good. (9) Defendant would also represent that when, at the last term of the court, the said grand jury was reassembled as aforesaid, your honor, in your instructions to said grand jury, stated to such body, substantially, that it was of the highest importance to the State that all of the witnesses knowing anything about the transaction for which defendant here stands indicted should be brought before such grand jury, and thoroughly examined about such homicide, 'and it will be well for you to remember what said witnesses testified, as parties sometimes change their testimony.' (10) Defendant also represents that his wife, Lula B. Gaines, was a material witness for him in the said case of assault to murder; that said application for continuance was sought to obtain the testimony of his wife, among that of others; that Dr. Neathery, a practicing physician at Van Alstyne, in Grayson County, Texas, and a reputable citizen of the county, made a certificate and affidavit, which was presented in connection with said application to continue, to the effect that defendant's said wife was sick, and in such condition that she could not attend court at the trial of said cause; that after the motion to continue said case was overruled, and after said case was tried, and after defendant's wife had failed to testify in said case on account of said sickness, your honor went to Van Alstyne, and there upbraided the said Neathery for making said affidavit. (11) Defendant would also represent and show to the court that the first indictment presented against him was quashed on or about the 19th day of August, 1895; that prior to that time defendant had procured the issuance and service of process for and upon certain witnesses in his behalf; that, when the grand jury for this term of court were impaneled, such body, following the instructions as given aforesaid by your honor, caused process to issue for and be served upon the defendant's said witnesses served with process on the first indictment as aforesaid. (12) Defendant would represent and show to your honor that by reason of the conduct, declarations, and statements of your honor as above set forth, that he can not expect a fair trial at the hands of your honor; that your honor has become so prejudiced and biased against this defendant that you can not calmly and dispassionately try this cause; that the mind of your honor is so biased and prejudiced against this defendant that you can not with fairness and impartiality pass upon the admissibility of testimony that may be offered on the trial of the case; neither could your honor, if it should become necessary, with fairness and impartiality weigh the testimony on the motion for a new trial, or any other motion or matter that might be presented or that might arise during such trial. (13) Defendant would also represent that the trial had before your honor, by reason of the prejudice hereinbefore mentioned,

could not give defendant a fair and impartial trial, and would not give defendant equal protection of the law; and he charges that such a trial would be in violation of article 6 of the Constitution of the United States, and of articles 5 and 6 of articles in addition to and amendment of the Constitution of the United States, and especially of section 1, article 14, of articles in addition to an amendment of the Constitution of the United States of America, and also of the several acts of Congress passed in pursuance of the provision of such Constitution—all of which will fully appear on reference to affidavits of certain citizens of Grayson County, hereto annexed and made a part hereof, and marked Exhibits Nos. 1 to 16, inclusive. (14) Wherefore defendant prays that, on account of the foregoing facts and prejudices and prejudgment of his case, that your honor will take notice and be satisfied that a trial alike fair and impartial to the accused and the State can not be had in this county before your honor; and your honor will therefore, on your own motion, order a change of venue in this case to any county in an adjoining district to your honor's and that you will state in your order the grounds of such change of venue. That this prayer is made under the provision of article 613 of the Code of Criminal Procedure, and this prayer is addressed to the sound discretion of your honor. If, however, your honor should be of the impression that it is not solely of the laws of this State to grant a change of venue in criminal cases, except in order to protect the right of the defendant, and your honor is also of the impression that, when the venue of the case is changed, that it is harder to procure the attendance of witnesses, and oftentimes prevents justice from being done, and entails great expenses on the State, then defendant, in order that he may obtain a fair and impartial trial before an unprejudiced and unbiased judge, respectfully requests your honor to change districts with some other district judge during the pendency of this trial; or, if your honor should be of the impression that you should not exchange districts with some other district judge qualified to try this case, then defendant respectfully requests your honor, to the end that he may have a fair and impartial trial before a competent and qualified judge, that your honor will vacate the bench and leave the courthouse, to the end that a judge might be selected in the manner provided by law, not subject to any disqualification, and before whom this case may be tried. All of which is respectfully submitted."

To this bill is appended the evidence adduced by affidavits in support thereof. Said affidavits are made by persons living in various portions of Grayson County, and they state that soon after the homicide they heard that Judge Bliss had said that defendant was guilty of a cold-blooded assassination and ought to be hung, or words to that effect; that this was the common talk in their neighborhoods. N. W. Bowles, in his affidavit, states that a few days after the killing Judge Bliss said to him and Judge J. H. Wood that it was a cold-blooded assassination, and he was going to bring him to trial as speedily as possible. In reply to appellant's motion, the State filed an answer. Said answer questions the suffi-

ciency of said motion on the ground that it does not show the character of prejudice authorized by the statute to change the venue in the case, nor does it show a formidable combination of influential persons. To the bill itself is appended the court's explanation, which we here insert:

"The foregoing bill of exceptions is allowed, with the following statement, to wit: At the time of the presentation of the application for the change of venue, etc., set forth in the foregoing bill of exceptions, I notified the attorneys of the defendant that I would, as soon as I had the time, prepare and cause to be filed in this cause a statement in reply to the matters set forth in said application, etc., in which statement I would set forth matters within my own knowledge which I considered in passing upon said application, etc. I also apprised them of the general nature of such statement, and invited them to procure, if they desired and could do so, any affidavits contradictory to my statement, which affidavits I would allow to be embodied in the record of this cause. The cause of The State of Texas v. W. R. Gaines, wherein the defendant was charged in this court with an assault on C. H. Koch, with intent to murder the said Koch, after having been set for trial on June 20, 1895, had been reset for trial—my recollection is, at the request of the defendant—for July 8, 1895, together with the case of The State of Texas v. Robert McClain, and other cases. On said date of July 8th a jury had been impaneled to try the McClain case, and the witnesses in that case had just been sworn, when four shots were heard in succession, apparently right at the courthouse, followed by screams in a woman's voice. This produced a general stampede from the courtroom of all persons there, except the prisoner, Robert McClain, the officer guarding him, the jury, and myself. After an interval, two or three individuals came into the courtroom, of whom I inquired as to the occurrence. The only information I got from them was that a man named Koch had been killed in the courthouse yard by a man named Gaines. Shortly afterwards Mr. I. M. Standifer came in, and gave me an account of the occurrence, professing to have been an eyewitness thereto. The conversation between him and myself occurred in front of the judge's desk, in the district court'room, and about six feet from where the jury impaneled in the McClain case was sitting. All the proceedings of the court had been suspended, and it was during an enforced recess. The members of the jury were conversing among themselves at the time. Mr. Standifer said to me that he was sitting in a buggy near the point where the walk from the north gate of the courthouse yard joins the concrete sidewalk on the north side of the courthouse square, when he saw a man in the act of wheeling and jumping from the sidewalk, and simultaneously heard a shot. Mr. Standifer said that the man who had jumped from the sidewalk ran towards the gate of the courthouse yard, and he (Mr. Standifer) saw a man standing on the sidewalk taking deliberate aim and shooting at the fleeing man as he ran; that the fleeing man's gait became a kind of trot, and he seemed to be gradually sinking down, until, shortly after he entered the courthouse

yard, he fell. Mr. Standifer said the man who did the shooting seemed to take as deliberate aim as if he were shooting at some sort of game; that he (Mr. Standifer) felt like he would like to have had a Winchester to shoot the man who was shooting at the poor devil trotting along, who, anybody could see, had already received a death wound. I inquired of Mr. Standifer whether the slain man had any weapon in his hand, or made any demonstration. He said, 'No;' that he ran with his hands hanging down by his side all the time. I then remarked to Mr. Standifer, in an ordinary tone of voice, that it was, then, a cowardly assassination, and that the killer ought to be hanged. Mr. Standifer informed me that the slain man was Koch, whom he knew, and that the slayer was Gaines, whom he had not known until that day. Shortly after this conversation with Mr. Standifer, I went down into the crowd that had gathered around the dead man, and, after staying a few minutes, returned to the courtroom. The county attorney, the counsel for Robert McClain, and the witnesses having returned to the courtroom, we proceeded with the trial of McClain, who was acquitted that evening. The next day we proceeded with the trial of cases in their regular order, as they appeared on the setting; and on July 10, 1895, the cause of The State of Texas v. William Gaines (the assault to murder case) was regularly called for trial, and the defendant presented an application for a change of venue, which the State controverted. It then developed that Mr. Standifer and his law partner, Louis Eppstein, had been employed by the defendant to assist in his defense. Quite a crowd gathered in the courtroom during the trial of the application for a change of venue in the assault to murder case, and a large number of witnesses were examined on both sides. Many of the witnesses placed by defendant's counsel on the stand in support of their application for change of venue in the assault to murder case were interrogated as to whether they had heard discussed the remark I have heretofore detailed as having been made by myself to Mr. Standifer; counsel stating at the time that they were not asking these questions for the purpose of reflecting in any way on the court, but for the purpose of showing that this remark was being generally circulated by the enemies of Gaines for the purpose of exciting prejudice against him. This, of course, gave the matter great publicity, and the newspapers published in Sherman mentioned it. A reporter came to me, and inquired of me as to the remark. I gave him a correct statement of the facts. He wanted to know whether I had any objection to his publishing what I had said to him. I told him, 'Certainly not,' as the matter was already published. I requested him, however, to omit any mention of Mr. Standifer's name, as he had been employed by the defendant, and it might operate to his prejudice with his client. I also told various friends of mine, who talked with me about the matter, of my remark that had been made so prominent in the trial of the application for change of venue in the assault to murder case—exactly what I said to Mr. Standifer and how it came about. Among these, I told County Judge Wood, in the presence of M. W. Bowles. This talk with Judge Wood, however, was merely a state-

ment of the conversation between Mr. Standifer and myself, and how the remark came to be made. I did immediately reconvene the grand jury for the purpose of investigating the killing, and did say to them, in my charge, substantially what is set forth in the application for a change of venue, etc., presented by the defendant in this cause. The statement in said application, etc., that I upbraided Dr. Neathery for having given the certificate mentioned in said application, is not true. Dr. Neathery was in attendance as a witness during the trial of this cause, and, while he was so present, informed the Honorable M. H. Garnett, one of defendant's counsel, that he and his co-counsel would have the opportunity of procuring an affidavit from Dr. Neathery, as I proposed to deny the truth of the statement that I had ever upbraided him. Dr. Neathery, while here, informed me that defendant's counsel had requested him to make an affidavit to said statement, but that he declined to do so, for the reason that it was not a fact that I had ever upbraided him. As to the matter of the telephone incident, which I have caused to be stricken from the record as impertinent and scandalous, I do not deem it worthy of further notice. As to my being prejudiced and biased against the defendant, so that I could not give him a fair and impartial trial, I can only say that it is not and was not true. To say that I did not have the opinion that he was guilty of the murder of Koch would be a contemptible piece of hypocrisy, which I would disdain; but this opinion was based entirely upon the statement of Mr. Standifer, and of other men of high standing, who were eyewitnesses to the killing, and not upon any personal bias or prejudice against the defendant, which I never had. I hardly knew the man by sight when the killing occurred, and knew nothing of his character as a man until his trial for assault to murder at the last term of my court. I had not the slightest prejudice or bias against him as an individual. During his trial in this case I faithfully and conscientiously endeavored to give him an absolutely fair and impartial trial. In fact, I solved every question that was doubtful to my mind in his favor during the admission of the testimony, and any immaterial matter that was sought to be introduced, which I considered might be prejudicial to him, I rigidly suppressed, whether objected to or not. A statement made in said application, etc., as it was originally presented to me, but which is not contained in the foregoing bill of exceptions to the effect that I made a certain remark about Mrs. Gaines, defendant's wife, is not true. I never made such a remark to any one. I will state further, in connection with this bill, that, from the conduct of counsel of defendant, that there was an organized effort to drive me from the bench, somewhat political in its character.

 [Signed]       "Don A. Bliss,
       "Judge Fifteenth Judicial District."

 As to the explanation to said bill, we would observe that the same can not be used as evidence to support or disprove the allegations contained in the motion or the affidavits appended thereto; said explanation not

being sworn to by the judge. See Abrams v. State, 31 Texas Crim. Rep., 449; Railway v. Mackney, 83 Texas, 410; Slaven v. Wheeler, 58 Texas, 23. We are accordingly left to consider appellant's motion on the proof offered by him; and conceding that appellant, by his affidavits, has established that the judge did declare on the day of the homicide that the killing by Gaines of the deceased, Koch, was a cold-blooded assassination, and that he ought to be hung, and that these expressions of the judge were reported and gained currency throughout the country, the question then presents itself: Does the motion show such cause as would authorize or require the court below to change the venue? This motion does not present one of the statutory grounds for a change of venue. Our statute enumerates the grounds for a change of venue, and the prejudice of the judge trying the cause is not one of the enumerated grounds. See Johnson v. State, 31 Texas Crim. Rep., 462; People v. Mahoney, 18 Cal., 185; People v. Williams, 24 Cal., 31; McCauley v. Weller, 12 Cal., 500. However improper and indelicate such expressions as are here attributed to the judge may be, they do not of themselves afford a ground for a reversal of the cause. As was said in McCauley's Case, supra: "If the judge act illegally on the trial, or deny the prisoner his legal rights, this would be a cause, on appeal, for reversal, but we can not undertake to say that this consideration operated a legal disqualification of the judge to sit." The most that can be said (as was intimated in Johnson's Case, supra) is that such conduct will cause a closer and more rigid scrutiny of the errors complained of.

2. Appellant contends that the court was not authorized to set this case for a day during the term prior to the day set for taking up the criminal docket, and he cites us to article 638 of the Code of Criminal Procedure of 1895. This article has reference solely to a day to be set by the court for taking up the criminal docket, but article 646 of the Code of Criminal Procedure of 1895 authorizes the court, in its discretion, to set any day of the term for the trial of a capital case, and this is controlling.

3. Appellant's next bill of exceptions brings in review the action of the court in refusing to continue the case on his application. The continuance in this case was craved by the defendant on account of the absence of Sam Whitaker. The application shows that said witness had never been subpoenaed; that by mistake a subpoena was issued for and served on one John Whitaker; that the name "John," instead of "Sam," occurred in the subpoena by some mistake, which was not known until the morning of the 28th of October, 1895; that said Sam Whitaker was at Van Alstyne, only sixteen miles distant from the court, and he could, after the discovery of such mistake, have been had at the trial, but for the fact that he was then too sick to attend; and that consequently no amount of diligence could have procured his attendance. Appellant shows that he expected to prove a threat made by the deceased, Charles Koch, against the defendant, shortly after July, 1894. The language used as conveying the threat was as follows: "That witness heard Koch say [referring to Gaines]: 'Yes; the damned son of a bitch shot at me,

and I intend to kill him. He and I can't live in the same country together.' " Conceding that sufficient diligence had been used with reference to this witness, we do not believe, under the facts and circumstances of this case, that the testimony of said witness was of that material character which would require a reversal of the case. Appellant proved a number of threats of a similar kind made by Koch against him about the same time, and he also proved threats made by Koch, against his life, of a more recent date. So we take it there could have been no question in the minds of the jury who tried the case that Koch made threats against the life of the defendant. However, under the proof in the case it occurs to us that such threats would serve no legitimate purpose, either as evidence of justification or mitigation, or to show who probably made the first attack. We will forego a discussion of the proposition involved in this question until we come to treat a subsequent bill of exceptions.

4. On the trial, appellant put his wife on the stand, and she was examined in chief. Said examination in chief covered considerable ground, the main points of which were: That while she and her husband were living or staying in Indiana, with certain of her relatives, and the deceased, Koch, also being there, her brother advised her to separate from her husband, on the ground that he did not think her husband treated her right, and that he could manage her money better than her husband. That she had quite a number of these conversations with her brother, in which he gave her such advice, but she never told her husband anything of them. That her husband, somehow, came to suspect or know about it. About 1892, she states, substantially, she and her husband moved back to Texas, and also the deceased, Koch. Her testimony then relates to various places at which she and her brother lived in and about Van Alstyne. That during part of the time her brother was separated from his wife, and lived with them. That on one occasion her husband and her brother had some words in regard to a meal which she had cooked. That her brother made a remark about the steak, and that he took it and threw it off the table into the yard. That at the time her husband was in an adjoining room, and came in, and she grabbed her brother, and Forrest Gaines grabbed defendant, and they kept them apart. That after that her husband, on one occasion, got huffy because the bread did not suit him, and that he got up and left the table. That her brother then advised her to leave him. That she told him she would not. That this was the first occasion in which her brother did not hold up for her husband, as against her. That her husband overheard the conversation between herself and her brother in which her brother advised her to leave him. A short time after this her brother ceased to live with her. She also testifies as to the killing of Jim Gaines (her husband's brother) by the deceased, which occurred in January, 1893. That after that her brother moved to Denison. Some time subsequent to that she understood her brother had decided to move back to Van Alstyne from Denison, and she and her husband decided to go on a farm in the country. That she told her husband that, under the circumstances, it would be better that he

and her brother would not be thrown together. However, her brother bought the Arnspiger place, which was between their place and Van Alstyne, and moved to it shortly before they moved out on their farm. That, after her brother bought the Arnspiger place, she had a conversation with him relative to that place, and why he bought it; and she suggested that he ought not to have moved so close to her, as he had killed her husband's brother. That he remarked that he was going to move there so he could see that her husband (Gaines) did not mistreat her, that he had already killed one of the Gaineses, and that, if any of the rest of them ever crossed his path, he would kill them all. She relates: That in July, 1894, her husband shot at her brother. That on that day, she and her husband being at home, and having just returned from Van Alstyne, her brother came by the house, stopped, and called for her. She at first refused to go, but subsequently went to the gate where he was. He was riding in a jump seat, and had a Winchester gun with him. That her husband at the time was putting up the horse and buggy. That, after she and her brother had talked a little while, he started on, leading his horse. That her husband came out and shot at her brother from the house. That this occurred on Monday. That on the following Wednesday she and her husband were in Van Alstyne, and she saw her brother's horse and buggy hitched in front of the saloon. That she was apprehensive that a difficulty would occur, and that she watched for her brother. Directly she saw him step to his buggy and pull out his Winchester gun. That he stood there with the gun some time. That her husband had then gone around the corner. That she was so excited about the matter that she called on the mayor (Mr. Cave), and told him that she apprehended there would be trouble, and requested him to go and talk to her brother. That subsequently she saw Mr. Cave go to where her brother was, and take him by the arm and lead him into the saloon. That, after the killing of Jim Gaines, "my husband seemed to be uneasy at his home and about the place at night. I was uneasy for him, too. He would never sit in a lighted room after dark, and I never approved of his going out alone after dark. He often went out alone, but I never wanted him to go alone. When he was sitting on the gallery, some of us were there with him. Usually I was with him. I was uneasy about defendant. I did not know what would happen to him. I had heard threats, and I knew, if my brother took a notion, what he would do." That on the day of the homicide she and her husband came from Van Alstyne to Sherman on the train. That after arriving at Sherman she went immediately to Smith's boarding house, and ate her dinner there. That her husband did not eat dinner there, but a little after 1 o'clock he came to the boarding house, and remained about ten or fifteen minutes. That she and her husband left the boarding house about half past 1 o'clock, and came up the street together, and the last time she saw him before the shooting was over at the Anchor corner. That when her husband came down to Smith's he told her that it was not necessary for her to go to town; that he would send for her if he needed her in the trial of his case,

which was to occur on that day.  However, she desired to go to town, and went with him.  That while she was on the way with him to town she told him to be careful; that she was uneasy about him that day; that she was afraid something would happen to him.  That she went into Goldsmith's dry goods store, and her husband went on, as he stated, to Smith's law office.  That some half hour after that she heard shots fired, and she said, "There, they have killed Billy at last!"  That some time prior to the homicide, and after the difficulty in July, 1894, when parties came to their residence at night and rapped she always went to the door herself.  She said: "I always went to the door myself, because I was afraid for my husband to go.  I thought probably some one would shoot him down as soon as he opened the door, and, of course, I feared my brother.  I had no one else to fear but him."  The balance of her testimony in chief relates to what occurred between Gid Hewett and her husband the day before the homicide, and is contradictory of the testimony of that witness, and need not be here stated.

The substance of the examination in chief of this witness is thus stated because a number of bills of exception relating to her cross-examination are reserved; and it is insisted that said matters drawn out in cross-examination were not pertinent or germane to the examination of said witness in chief, but were original testimony drawn out by the State from the wife of the defendant, thus making her a witness against him, which was not authorized by law.  It is not necessary for us to state here all of the testimony that was objected to on this account, because it is sufficient, in order to properly dispose of this matter, to state the most important testimony that was thus drawn out by the State on cross-examination.  Bill of exceptions number 11 shows that on the cross-examination of Mrs. Lula Gaines, the wife of appellant, the State was permitted to ask her "if, on a certain occasion, defendant did not tell you that, if he ever caught you and your brother talking together, that he would kill you both?"  To which the witness answered that she could not state it in that way, but that "he objected to us talking together;" that she did not think her husband had "caught part" in it.  Bill of exceptions number 25 shows that the witness, J. W. Truly, on behalf of the State, testified that a short time after the homicide, at the Alexander Hotel, in Van Alstyne, he heard Mrs. Gaines say that Charley would not have hurt a hair on Bill's head; also, that the defendant had often told her that if he ever caught her and her brother talking together he would kill them both.  This evidence was in contradiction of Mrs. Gaines' testimony, above alluded to, on cross-examination, or intended to impeach her as to the testimony given by her as shown in bill of exceptions number 11.  Bill of exceptions number 13 was assigned by the appellant to the cross-examination of Mrs. Lulu Gaines in which she was asked: "Did you not go to your brother's house on Sunday night, before he was killed, on Monday, and tell him that he would be killed if he came to Sherman the next day?"  The witness answered: "Yes; I warned him not to come to Sherman."  Bill of exceptions number 26 was taken to the action of the

court in allowing the State to prove by the witness E. S. Haynes, in contradiction of the State's witness Mrs. Gaines, and to impeach her, that he had a conversation with Mrs. Gaines on July 17th, after the homicide, in which she told him that she went to her brother's house on Sunday evening, the day before the killing, and told him not to go to Sherman the next day, as she feared or believed Gaines would kill him if he did go. Bill of exceptions number 18 is taken to the cross-examination of Mrs. Lula Gaines as to a conversation claimed to have occurred at Mrs. Koch's house, in the presence of Mrs. Koch and Mrs. McMillan, on the morning after her brother was killed; and she was asked if, on said occasion, she did not say to Mrs. Koch (alluding to a certain black dress which had been brought over, at her request, for her to wear), "I had that dress made over a year ago to wear to Charley's funeral, expecting him, at any time, to be killed." To which she replied she did not remember it. Bill of exceptions number 21 shows that the State was permitted to impeach Mrs. Gaines in regard to the purpose for which she had made said black dress, by Mrs. Day Koch. Bill of exceptions number 22 shows an impeachment by Mrs. McMillan in regard to the purpose for which said black dress was made. Bill of exceptions number 24 shows that she was impeached about the same matter by Mrs. Thompson.

These bills of exception present the most material parts of her testimony objected to, and on which she was permitted by the court to be impeached by the State. However, all of the bills of exception, from 11 to 26, inclusive, present objections urged to the cross-examination of Mrs. Gaines by the State, and impeachments of her by other witnesses introduced by the State. The ground of appellant's objection to this character of testimony was that same was not pertinent or germane to her examination in chief, and she could not be impeached on account of such illegal testimony. We have examined the record very carefully, and we agree with appellant to the effect that there was nothing in the examination in chief of the witness Mrs. Gaines to authorize this cross-examination, nor is there anything in the bill of exceptions, as explained by the judge, to authorize this character of testimony. Mrs. Gaines related in her examination in chief no conversation or part of a conversation between herself and her husband, no threat of his that authorized the State to cross-examine her with reference to any declaration that may have been made by her husband to the effect that if he saw her and her brother talking together, that he would kill them both; and yet the court, although she stated that she did not remember any such conversation, permitted her to be impeached as to these matters. Of course, if she had been examined in chief as to any conversation between herself and her husband, the whole of said conversation relating to the same matter, and explanatory thereof, would have been admissible; but it was not admissible because she had been introduced by her husband on other matters, and it was not proper to prove as original testimony, on cross-examination, this threat of defendant, by his wife. As to the black

dress, no inquiry was made by the defendant as to this matter in the ex-
amination in chief.   Nevertheless, on cross-examination the State was
permitted to show, not any fact stated or done by the appellant, but
something that she did; that is, she made a black dress about a year be-
fore the homicide to wear to the funeral of her brother, expecting her
husband to kill him.   This was the purpose of the State in her cross-
examination, but failing to elicit her purpose in making the dress, the
State was permitted to impeach the witness upon this ground.   As to
her warning her brother not to go to court on the fatal Monday, she
stated that she told him not to go, but that she did not state that it was
because she feared her husband would kill him.   Her warning her
brother was not any fact that had been inquired about by the defendant
in her examination in chief, and the State should not have been per-
mitted to cross-examine her upon this subject; much less, to contradict
her by the witness Haynes.   The same observations apply to all of the
other bills of exception on this branch of the case.   The testimony was
illegal, and the witness should not have been cross-examined upon these
matters, nor should she have been impeached by contradictory evidence.
See Jones v. State, and authorities there cited, ante, p. 87.

In order to present the importance of this testimony as bearing upon
the case, we will state substantially the testimony of the witnesses as to
the killing, and the facts and circumstances immediately connected
therewith.   Before doing so, however, we would observe that the killing
occurred in Sherman on the 8th of July, 1895, about 1 o'clock in the
evening of said day.   Defendant and deceased were brothers-in-law, de-
fendant having married the sister of the deceased.   The killing was on
Monday, which day had been set for the trial of a case against the defend-
ant in which he was charged with an assault with intent to murder Koch,
the deceased, alleged to have been committed in the summer of 1894.
Defendant was there in attendance on the court, and the case was ex-
pected to be called up that evening.   Deceased was there as a witness
against the defendant.   The homicide occurred in one of the most public
places in the city of Sherman, and a crowd was then on the street, and
in the vicinity of the homicide.   Deceased, at the time of the shooting,
had crossed from the courthouse, along a plank causeway, towards the
stores on the north side of the public square, surrounding the courthouse,
and had approached at or near the concrete sidewalk at the time the first
shot was fired.   Said shot was fired by the defendant, who at that time
was standing on said concrete sidewalk, at a point near where the plank
walk from the courthouse to the concrete sidewalk approached and joined
said sidewalk.   Four shots were fired, two of which took effect in the
body of the deceased—one striking him on his left side, below and just
in the rear of his left shoulder blade, and coming out on his right side,
in front of and between his right nipple and arm; the other striking him
on his left side, about the hip bone, and coming out on the left side of
his stomach.   At or about the time of the firing of the first shot deceased
turned to run—ran back south, either on or near said plank walk—de-

fendant continuing to shoot at him; the last shot being fired about the time deceased ran into the gate of the fence surrounding the courthouse. Deceased fell and expired inside of the courthouse yard. The testimony also shows that bad blood had existed between deceased and defendant for some two or three years antedating the homicide, and the record shows that threats had been made by each of said parties against the other. The record also discloses that in the summer of 1894 deceased, having heard that defendant mistreated his sister, went to the residence of defendant and called his sister to the gate, and was conversing with her in relation thereto, when the defendant came out on the gallery of his house, and as deceased was walking away, leading his horse, fired several shots at him. It is also proper to state that deceased, it appears, came to Sherman on the morning of the homicide unarmed, but some time during the morning borrowed a six-shooter from Grigsby, and that he had said pistol on at the time of the homicide, and it was sticking in the waistband of his pants, at the left side. Some of the witnesses who came to the body of the deceased after he fell state that his vest was open, while others state that his vest was buttoned up, his pants and vest concealing his pistol.

The following witnesses testified for the State as to what occurred at the time of the homicide:

Frank Bowers testified: That he was standing in front of the store, on the north side of the square. That when he first saw the defendant he was in front of Exstein's front door. Defendant had a pistol when he first saw him. That he was raising it up, or had it up in his hand, at that time. That, when he first saw the defendant with the pistol in his hand it was but a second until he shot. That defendant shot as soon as he could get the pistol in shooting position. Koch was then about ten feet out on the plank walk leading from the concrete walk on the north side of the square to the courthouse. Defendant's face was turned south, towards the courthouse, and Koch was coming across towards the courthouse. When he first saw the defendant he was northeast from where the plank walk intersects the concrete walk, and when the first shot was fired Koch had his face towards the south, and his back and side were turned towards the defendant's left side. Koch was running when the defendant fired the first shot—running from the defendant. His hands were down at his sides when the first shot was fired. About the time the second shot was fired Koch raised his hands up and caught his coat about his breast. When the second shot was fired Koch was running on south, towards the courthouse, and going from the defendant. After defendant fired the first shot he walked up to the end of the plank walk going to the courthouse. He moved in a southwest direction from where he was when he fired the first shot, and fired his last shot when he was there. Koch was about going through the gate into the courthouse yard when the last shot was fired. He was running, but not fast. Blood was spurting from Koch's mouth when he was halfway across the street from the concrete walk. That was between the second and third shots, and soon

after he caught his coat in front of him. Witness further stated that
when he first saw Koch, on this occasion, he was right at the edge of the
plank walk where it joins the concrete walk on the north side of the
square. He seemed to be motioning to turn. His body was turned
around when he first noticed him. His motioning to turn to run first
attracted witness's attention. That was before he saw defendant with
the pistol. When he saw the motion to run, he looked to see why
he was running, and then saw the pistol. Koch's movement in
turning to run first attracted the witness's attention. When he first
saw him Koch's face was turned towards the east, and he was
turning towards the south. Then he ran ten feet before the
first shot was fired, and was on the plank sidewalk leading from
the concrete walk to the courthouse. He ran several steps before the sec-
ond shot was fired, but not far, for the shots were close together. Koch
was about one-third of the way from the concrete walk to the courthouse
gate when the second shot was fired, and was over halfway across when
the third shot was fired, and was about at the gate of the courthouse
yard when the fourth shot was fired. When the first shot was fired
Gaines was back of, and a little to the left of, witness. Witness further
stated that about the time the second shot was fired Koch raised his hand
up in front of him, and caught his coat. His side was to witness, and he
could not state where his hand was. He did this with his right hand.
He was at the time going from witness, and his back and side were
towards him. Witness could not see his hand, but thought that he
caught his coat.

I. M. Standifer testified, substantially: He was in a buggy out in
the street, west of the walk that leads from the north side of the court-
house square to the courthouse. He was going east, and was sixty or
seventy feet west of the plank walk, and about thirty feet south of the
concrete walk, on the north side of the square. That he saw deceased
going hastily from the concrete walk east of the plank walk that leads
north from the courthouse. His face was turned southwest. Defendant
was nearer the sidewalk than the deceased, and was north of the deceased.
Defendant had a pistol, and shot. Koch was moving, and was in a some-
what wrenched position when the shot was fired. He was cringing, as if
expecting something. Witness's recollection was that Koch was not
exactly with his back to the defendant, but his left side a little. After
the first shot was fired deceased continued towards the entrance to the
courthouse, in a trot, running from where the defendant was. Defendant
walked a step or two forward after the first shot was fired. Three or four
shots were fired. Koch continued running south while all the shots
were being fired. He went to the entrance of the courthouse yard and
sank down and was about ten steps from the gate when he fell. When
the first shot was fired Koch's hands were at his side. His right hand was
at his side and his left arm was raised in a cringing manner. At no time
while Koch was running across the street did he ever put either hand
from his side from where he started to where he fell. That he noticed

him closely. That he had a good view of him, and did not see any blood spurting from his mouth as he ran to the courthouse gate. When Koch was going towards the courthouse, after the shooting began, at no time did he put his right hand, or either hand, up to his breast, or anywhere about the front part of his body. They hung limp to his sides. When he first saw Koch, at the time of the shooting, he was at the concrete walk, and east of the plank walk leading to the courthouse. When he first saw defendant, he was off of the concrete walk. The first thing that attracted witness's attention was the show of the pistol, and nearly instantaneously the firing of it. That he had no idea what occurred between the parties prior to that time. If Koch ever raised his hand to his breast it was before the firing began, for there was no movement of his hands after that.

R. E. Smith testified, in effect: That he was standing near there, on the concrete sidewalk. That he did not see how the difficulty began, but he heard a shot fired, and looked around and saw the defendant, with a pistol, come out from among some people that were standing there. Saw him raise the pistol. That he then saw deceased. That he then saw defendant pull down on the deceased. He was standing five or six feet from witness. That he was looking towards the sound of the pistol, but, when deceased "flirted" off, defendant at once wormed himself around from the crowd and went in pursuit of the man. Koch went towards the courthouse, and defendant fired the second shot at him. Witness stated that his impression was, that as Koch went off towards the courthouse, he put his hands to the lapel of his coat. He did not seem to have his hands at any fixed place. He was moving his hands towards his chest. It was an unsteady motion. Witness stated that he did not see the first shot that was fired; did not know who fired it, or anything about it.

W. C. Jones stated: That he was on the concrete sidewalk, in the vicinity of the homicide. The first he knew of the shooting he heard the report of the pistol. The shot was fired a foot or a foot and a half behind him. He saw Koch as he turned. When the shot was over, witness dodged, and saw Koch running across the street, within fifteen or twenty feet south of the concrete walk, when he turned to run. When the first shot was fired he dodged to one side and saw defendant with the pistol. Defendant moved up a foot or two, and fired the second shot. Koch was coming across the street when that shot was fired. He was running in a little dogtrot. That he saw the third shot fired. There were four shots fired. The shots were tolerably regular. As Koch went towards the courthouse his back was towards the witness, and he did not know what position his left hand was in. His right hand was up in front of him, on his coat. He was running bent over a little. That he did not hear the defendant say anything during the shooting. The party that fired the first shot was northwest of witness when he fired it. He saw Koch before he saw defendant. This second shot struck deceased about the hip. As deceased went off he had his right hand in front of him. His

back was to the witness, and he did not know where his hand was. He could not tell whether his hand was up near his throat, or down near the waistband of his pants. Between each shot defendant would bring his pistol down, and then raise it up and shoot.

Tom Keys stated: That at the time of the shooting he was on the north side of the square, and saw part of it. That when he first saw Koch, just before the shooting, he was coming from the courthouse and going north to the sidewalk on the north side of the square. That he did not know whether he got to the sidewalk or not. He got very near it, and witness noticed him no further. He turned off the walk leading north from the courthouse, and turned east before he got to the concrete sidewalk. Witness last saw him, before the shooting, walking along slowly, with his left hand in his coat pocket, with his thumb hooked over on the outside. Did not pay much attention, but his right hand was hanging down by his side. When Koch came over near the concrete walk witness was talking to a friend, and paid no more attention to him until the shot was fired. He was then very near the concrete walk. Witness was looking at Koch when the first shot was fired. About as quick as the first shot was fired witness looked and saw Koch turn. He turned eastward, and came back on the plank walk again. The first shot was fired from the concrete walk, and was about four or five feet east from witness. Witness was standing facing south. The shot was to his left, and a little behind him. Koch had turned off the plank walk to the east before he reached the concrete sidewalk, as if to go up Travis Street. When the shot was fired, and witness looked, Koch was turning, and had turned very near around, and he was turning facing south. Saw defendant after the first shot was fired. His pistol was already down when defendant first attracted witness's attention. Defendant stood perfectly still in the same place, and fired the second shot. Defendant had probably moved a foot or two, and stood near the edge of the concrete walk, when he fired the last shot. Koch had his head down as he came from the courthouse, and, up to the last time witness saw him before the shooting, he was apparently looking down. Witness was not positive about how he held his head all the way across the street. Witness remembered seeing Frank Grigsby with Koch as he came across from the courthouse. When he first saw defendant he was standing on the concrete walk northeast of the point where the plank walk connects with it. When he last noticed Koch, before the shooting, he was about eight or ten feet from the concrete sidewalk. When he saw Koch immediately after the first shot he was six or seven feet south of the concrete walk, and defendant was on the concrete walk, about three feet from the edge of it. Witness thought the second shot was fired before Koch got back on the plank walk. When witness saw Koch immediately after the shot, he was turning, and had his right hand up in front of him, about his waist. Witness further stated that it was after the first shot that Koch had his right hand in front of him, about his waist. As Koch was running away from the sidewalk witness never saw him try to get any

weapon. Did not know what his intentions were with his hands around there. Did not know what he was doing. Could not say that he saw Koch make any attempt to draw a weapon at all.

The following witnesses testified as to the facts immediately attending the homicide, on the part of the defendant:

J. F. Miller testified: That at the time of the shooting he was sitting down on the concrete sidewalk in front of McBee's grocery store, on the north side of the square, in Sherman, which was in the vicinity of the homicide. McBee's grocery store was four doors west of the sidewalk that leads out from the courthouse to the north side of the square. A few minutes before the homicide, and while witness was sitting in front of McBee's store, Koch passed on the pavement, going east, and crossed the plank walk, and went over towards the courthouse. Witness did not think he had time to go into the courthouse until he saw him coming back towards the north side of the square. As he was coming to the north side of the square, witness's attention was called to him. From the time he came out of the courthouse gate he had his hands swinging by his side until he got about halfway across from the courthouse on the way to the sidewalk on the north side, when he put his left hand up in front of him, and seemed to be scratching or adjusting something. Witness did not see what he was doing when he caught his right hand about the waistband of his pants. Witness took his eyes off him when he got within ten feet of the concrete walk. When he saw him again it was after the shot was fired. Witness took his eyes off of the deceased, but heard the shot, and looked that way again; and Koch was close to the pavement, with his face turned west, and he was making a turn west, and threw his left hand under his arm. He seemed to draw it far back. Witness did not know what for, and as he got turned south he started to run, and blood spurted from his mouth. The blood spurted just after the first shot. Koch ran about halfway from the pavement to the gate of the courthouse yard, and turned around, with his face west, and looked north again, and then the second shot was fired. Koch then turned again and ran, and the third shot was fired. The fourth shot was fired just as he crossed between the posts of the courthouse gate. Witness did not see who did the shooting. Did not see the man who did the shooting until he saw the pistol taken from him. He was looking in the direction of the shooting, but there were people on the sidewalk between him and the pistol. He could see the smoke from the pistol. Witness further stated: There was no one walking at the side of Koch as he went north before the shooting. That just before the shooting he saw deceased come across the square, but did not know whether his hand was at the waistband of his pants, or under his vest, or whether he pulled his vest down, or scratched, or what he did, exactly. He had his hand in his coat pocket until he got a little over halfway across the street. After scratching himself, witness did not think he put his hand in his pocket. When Koch looked around about the time

38 Texas Crim. App.—15

the second shot was fired, he did not come to a full stop. He turned himself, and "went kinder sideways." Koch ran faster at the start than he did as he came to the gate. He got slower all the way across. He never looked back but once after he started, and that was before the second shot.

Robinson states: That he was sitting on the concrete walk in the vicinity of the shooting. Was sitting on a goods box, talking with Tom Beatty. Heard the report of a pistol on the north side of the square, turned in that direction, and saw a man running across the square. When he first saw the man he was about fifteen or twenty feet from the plank walk which joined the concrete walk on the north side of the square. This man was running. This man had his hand up to the waistband of his pants. Could not tell exactly, but thought that was about the position of his hands. After he looked and saw a man running, there were three other shots fired, a half second apart. The man he saw running had his right hand up to the waistband of his pants. The man was in his shirt sleeves. Did not know whether he had on a vest or not.

Tom Beatty testified: That he was sitting talking with the witness Robinson. Heard a shot fired, and saw Koch turn and start to run across towards the courthouse. He was about two or three feet from where the plank walk joins the concrete walk on the north side of the square when he first saw him. Koch was not on either walk. He was south of the concrete walk, and east of the plank walk. He ran south on the plank walk, towards the courthouse. Three shots were fired after witness turned to look. When witness first looked towards Koch after the first shot, Koch had not turned plumb around. He had his right hand up in front of him—about his breast or stomach. Witness could not see the man who was shooting.

Witness W. M. Bowles stated: That he saw deceased (Koch) run at the time of the shooting. Witness was standing on the northwest corner of the square. When the first shot was fired, it attracted witness' attention and he ran down towards the shooting. Could not get quite to the place where the firing was. Witness saw Koch after the first shot was fired. He was running south, and a little west. He was bent over, and witness could only see his left hand. He had it up in front of him, like he had hold of his coat. Witness could not see his right hand at all.

A. G. West stated: That at the time of the shooting he was standing in front of the Q. T. Saloon, which is the first house east of Exstein's store. Witness was standing east of the shooting a short distance, and six or eight feet south of the concrete walk that runs along the north side of the square. Was standing out on the ground, and was looking northwest. Saw one man shoot another. Saw one man look like he was going to step to the concrete pavement. He made that motion, and then he jerked back. Another man had a pistol out in front of him, and shot him. Defendant did the shooting, and deceased was the man who was shot. When witness first saw the pistol, defendant had it up

in front of him, with his hand close to his body, about halfway between the waistband of his pants and his chin, and threw it straight out from him, and shot. At that time deceased turned around, fronting east, and was fronting witness when he turned. When deceased turned he made a motion with his hands about his waist, and witness thought he saw a pistol sticking in the waistband of his pants. Defendant was standing on the pavement at the time of the shooting, about four or five feet from the witness. Almost immediately after witness saw deceased turn he saw him bring his hands to his waist, and almost immediately defendant's pistol fired. He fired the second shot, holding the pistol out from him, bringing it up on the level with his face. Witness did not see but two shots fired, but heard more. There may have been three or four shots. Did not see deceased after the shooting. At the time of the shooting Koch was a little east of the plank walk that leads from the courthouse—about eight or ten feet east. He did not get on the concrete walk. He made a step, raised his foot, and came back. Witness further testified, that about the time he saw deceased jump back from the sidewalk he saw the defendant's pistol in front of his stomach. When he saw the pistol in front of defendant, defendant shot it without raising it. The pistol was fired about the time witness saw deceased jump back. The jumping back and the firing of the pistol were "sorter" together. Deceased jumped, and the pistol fired. Witness did not see defendant draw his pistol. He had it already out when witness saw defendant, and he shot the first time something near the first time deceased jumped back. Saw defendant have the pistol before he saw him shoot. Defendant had the pistol out before deceased jumped back. At the same time that deceased jumped back, he wheeled around, and as he wheeled around he grabbed both of his hands in front of his abdomen, and a little to the left side, with his left hand about his left hip, and his right hand about his stomach. Deceased grabbed his hands up in front of him, and turned. The turning and the grabbing were all together. He grabbed his hands up in front of him and turned, and then jumped backward, and witness saw what he took to be a pistol. Defendant had hold of his pistol. Witness could not say that he saw anybody else have hold of a pistol. Witness further stated that he did not know whether the jumping business was a demonstration or not.

From this statement of the case the question presents itself for our consideration, whether the admission of said illegal testimony on the cross-examination of Mrs. Gaines, and the testimony offered to impeach her, was such error as requires a reversal of this case. The court charged murder in the first degree, murder in the second degree, manslaughter, and self-defense. Unquestionably, there was, from the evidence in the case, murder in the first degree, possibly murder in the second degree, and there was some testimony tending remotely to present self-defense. This being the case, the testimony of Mrs. Gaines was strongly calculated to assist the State in making out murder in the first degree, and therefore injurious to the appellant. For instance, she states that on

Sunday evening, before the homicide, she went over to her brother's, and warned him not to come to Sherman the next day, which was the day set for the trial of her husband for the assault on her brother. This conduct was inadmissible. It contained no act or demonstration of the defendant. It simply established the apprehension of the witness. But from this conduct the jury had the right to infer that Mrs. Gaines had heard her husband threaten the deceased, or from his conduct and words she believed that, if the deceased came to Sherman, he would kill him. As stated above, the act of Mrs. Gaines was not in response, explanation, or germane to anything drawn out by appellant in her examination in chief. Her act was simply evidence in chief on the part of the State, and portrayed to the jury what she thought her husband would do in the event deceased went to Sherman on Monday. The acts and conduct of the witness are never admissible as evidence against anybody, but, where the acts and conduct are inconsistent with her testimony, they can be used to impeach, if they are pertinent and legal for that purpose. In the Drake Case, 29 Texas Criminal Appeals, 265, this court held that what the witness said the night of the killing of Professor Guinn, to the effect that he knew his father (Drake) was going to kill Guinn, was clearly inadmissible. What Mrs. Gaines said—her exclamations—at the time of the killing, when she reached the body of her brother, was clearly inadmissible for any purpose. It related to nothing to which she had sworn in chief. From her conduct and exclamations the jury had the right to infer that she was informed by her husband, or from his acts and conduct, that he was going to kill the deceased, and had executed his threats. In regard to the black dress the same observations apply. The State proved, over the objections of the appellant, that she stated that she bought it for the purpose of wearing to the funeral of her brother; anticipating, of course, that he would be killed by her husband. We would remark, with regard to all this testimony impeaching Mrs. Gaines, that she could only be impeached as to a matter sworn to by her on examination in chief, and that she can not be impeached by illegal testimony. The State could not put Mrs. Gaines on the stand, and, on failing to draw from her original testimony pertinent to the examination in chief, impeach her by showing that she had made certain statements. To illustrate: Suppose the defendant had introduced his wife, and by her proved that the deceased had made the most serious threats against his life; that he had attempted on certain occasions to assassinate the defendant. Now, the State would have the right to cross-examine her fully in regard to these threats and the attempted assassination. Everything bearing on those facts would be legitimate. But suppose the State, upon cross-examination, had asked her if she did not hear the defendant make threats against the deceased, and if the defendant had not waylaid and attempted to kill the deceased. This would not be germane to the facts elicited in chief, and could not be proved by the State. Now, suppose that the State attempted to make such proof by the wife, and failed to do so. She denied

that she ever heard her husband threaten the deceased, or that she knew anything about the attempted assassination. The State would have no right to prove by any other witness that she had stated that her husband had made the threats, and had attempted the assassination.

The court attempted to limit this illegal evidence by confining it to a certain purpose, to wit, to discredit Mrs. Gaines. This was clearly inadmissible, and should not have been done. Being inadmissible for the purpose of impeachment, it was beyond the power of the court to control it effectually, and the accused should never be required to take the risk of the court's successfully controlling evidence which is clearly inadmissible for any purpose. Of course, if the testimony is admissible for a purpose, appellant can only require the court to limit it to the legitimate purpose, and in such a case he takes the risk of the jury's using it for an improper purpose; but, being legal evidence, he can not be heard to complain. As stated above, there being suggested by the evidence other phases of the case than murder in the first degree, pure and simple, the illegal testimony admitted was of a character to affect injuriously the rights of appellant before the jury. The testimony was of a kind calculated to suggest to them express malice, and no doubt added weight with them in deliberating on their verdict. It is not here a question whether or not there is evidence sufficient for this court to sustain the verdict, but the question is whether or not the reception of the illegal testimony may not have influenced the jury in finding the verdict they did. Concede that there is evidence strongly tending to present murder in the first degree; yet, as murder in the second degree is suggested, and self-defense remotely suggested, how can this court determine that the illegal testimony obtained from Mrs. Gaines did not control the jury in reaching that result? In the very nature of things, it is impossible for us to determine that the illegal testimony did not enter into the deliberations of the jury, and actuate them, at least in some measure, in arriving at their verdict. See McWilliams v. State, 44 Texas, 116.

Appellant's bill of exceptions number 28 is to the refusal of the court to allow him to prove by the witness Bean that he talked with the defendant about his difficulties with Koch, and defendant proposed to drop them, etc. In view of the fact that threats had been proved on the part of the defendant towards deceased, this testimony might be admissible to show that defendant did not entertain any animosity against him at the time of such conversation. Such testimony could only be used to rebut animosity or malice shown to exist at the time, or before that time. The same observations apply to appellant's bill of exceptions number 29. We do not believe that the testimony shown to have been rejected in bill number 30 was admissible. It does not occur to us that it would shed any light upon this transaction. No error was committed as complained of in bills of exceptions numbers 31 and 32. Bill of exceptions number 33 presents an objection to the State proving by the witness Josh Wilkins the detail of the difficulty that occurred between deceased and defendant in 1894. As explained by the court, said

witness did not go into the details of said transaction. Unless the defendant by his testimony in some manner rendered the details of said former difficulty admissible we fail to see the relevancy of such details. We believe it was admissible for the State to show that deceased armed himself (defendant having first shown that deceased armed himself after he came to Sherman) on account of an anticipated difficulty with one Drye. According to bill of exceptions number 35, even as explained by the court, it does not occur to us that the proper predicate was laid by the witness West for his impeachment by the witness Smith as to the particular matter inquired about. West, being defendant's witness, if the proper predicate was laid for this matter, of course it would be admissible. Appellant, in his thirty-sixth bill of exceptions, raises the question as to the admissibility of W. F. Hamlin's testimony, offered by the State, to the effect that, while passing along the sidewalk in front of Bitting's drugstore, he heard some one explain, "No, by God! I won't do it;" that he then turned, and as he did so he saw the defendant and two other men leaning up against the wall of the building; that thereupon the defendant further said: "I am going to wind it up. I am going to wind it up. I've had enough of it." Witness also stated that defendant appeared to be a little excited. The bill shows that the defendant excepted to this testimony because the same was immaterial and irrelevant, and because such statements or declarations of the defendant were not shown to be in any manner connected with, or to have any reference to, the homicide. This bill does not show that the court certified as a fact that said testimony was not otherwise connected with the case. It occurs to us that, unless so connected by other evidence than this abstract expression, the testimony was not admissible. We do not think the court erred in excluding the testimony of the witness J. T. Sheriden, as shown by bill of exceptions number 37. We fail to see how this transaction would serve to shed any light upon the homicide in this case. What the defendant may have said about his reasons for building or not building the house, or moving or not moving to a certain place, or Koch's coming back, it occurs to us, was not calculated to shed any light upon the killing. In fact, a great deal of the testimony offered pro and con in regard to the details of former transactions that the parties may have had, it occurs to us, could serve no useful purpose in this case, and doubtless incumbered it, and was calculated more to confuse the jury than otherwise.

We do not deem it necessary to go into a discussion of the exceptions reserved to the charge of the court. For the error before discussed in allowing the cross-examination of Mrs. Gaines upon matters not brought out by the defendant in her examination in chief, and for permitting her to be impeached by other witnesses upon such matters, the judgment is reversed and the cause remanded.

*Reversed and remanded.*