## John McGaughey v. The State.

No. 3032.   Decided May 6, 1914.

Rehearing denied July 14, 1914.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence was sufficient to sustain the conviction, there was no reversible error.

**2.—Same—Jury and Jury Law—Oral Addresses of District Judge.**

Where, upon trial of murder, the district judge empaneled the jury for the week, and as he did so and before any case was called for trial, addressed them orally as to their general duties as jurors, to which defendant excepted at the time, but voluntarily accepted thereafter four of said jurors and did not exhaust his challenges nor question said jurors on their voir dire, and pointed out no injury, and the court thereafter delivered a writeen charge as the law required, there was no reversible error. Davidson, Judge, dissenting.

**3.—Same—Postponement—List of Jurors.**

Where defendant filed a motion to postpone the trial of the case for ten days to give him an opportunity to examine the list of jurors for the week, which the court overruled, stating that it was his rule that the names of the jurors drawn by the jury commissioners should not be given out until the week for which said jurors were to perform service, to avoid parties to tamper with them, etc., and the defendant was given ample time in which to investigate and pass on the various jurors on said lists, there was no reversible error. Davidson, Judge, dissenting.

**4.—Same—Objects of Statute—Jury List—Legislative Intent.**

The object and purpose of the statute in authorizing the clerk to open the envelope of the list of jurors selected by the jury commissioners for the week, ten to thirty days before· court convenes, is that the sheriff shall have time to summon them and that the jurors shall have time to arrange for their attendance, and it was not intended thereby to give litigants the opportunity to tamper with the jurors who are selected. Davidson, Judge, dissenting.

**5.—Same—Newly Discovered Evidence.**

Where the defendant did not bring himself within the rule authorizing the court below to grant a new trial on the ground of newly discovered evidence, there was no error in overruling his motion for new trial on that ground.

**6.—Same—Misconduct of Jury.**

Where it appeared on appeal by the judgment of the court below overruling defendant's motion on the ground of the misconduct of the jury that the court heard evidence thereon, and no statement of facts was filed of· said evidence on said motion in the court below before the court adjourned for the term, the same could not be considered on appeal. Following Graham v. State, 73 Texas Crim. Rep., 28.

**7.—Same—Newly Discovered Evidence—Rule Stated.**

Unless it be shown that the alleged newly discovered evidence has come to defendant's knowledge since the former trial, and shows due diligence; that

the evidence is material; that it will probably produce a different result; and that it is not simply for the purpose of impeaching a former witness; and that the court has abused his discretion in overruling the motion, there is no error.

### 8.—Same—Evidence—Explanation of Witness.

Where, upon trial of murder, the defense contended that the deceased and his wife were trespassers on the place where defendant also lived, there was no error in permitting the wife of the deceased to testify that the reason she remained on said place was that the father of the defendant had willed her the property; besides, the bill of exceptions was insufficient.

### 9.—Same—Charge of Court—Oral Address—Article 743.

What the trial judge said to the jury panel orally as to their general duty as jurors when he organized the same for the week was not a charge to the jury, but the charge to the jury was the written charge in the case, to which the defendant made no objections; besides, there were only four of said panel that served in the case, and no error appearing from the record which was calculated to injure the rights of the defendant or that he did not have a fair and impartial trial, there was no reversible error under article 743, Code Criminal Procedure. Davidson, Judge, dissenting.

Appeal from the District Court of Hood. Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*B. M.* and *Roy Estes* and *J. C. George* and *Chandler & Pannel* and *M. L. Arrington* and *W. F. Ramsey* and *C. L. Black,* for appellant.— Cited cases in opinion.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was indicted for murder in the second degree, convicted and his punishment assessed at ten years confinement in the penitentiary.

The evidence was ample to authorize the verdict. We see no necessity for reciting the facts.

There are some bills of exceptions and grounds of the motion for new trial, complaining of some unimportant matters. We have reviewed them all,—none of them present any error. In fact appellant, in his brief, does not present most of them. We will discuss and decide those questions briefed, as they are the only ones necessary to discuss.

Upon convening the court Monday morning the district judge empaneled the jury for the week, being those selected by the jury commissioners. As soon as he did so and before any case was called for trial, he said to the whole jury panel: ."That the people were governed by the courts, that the power to punish was the thing those of evil tendencies feared. That even in the business world the power to employ and discharge was the thing that secured obedience to the rules of the employer and good service to him. That in our government under our system the power to punish or to inflict a penalty for felony rests with the jurors. That our law provides that no man can be tried for felony

except by a jury. The jury, therefore, is an indispensable and all important branch of the court, and each of you, therefore, are officers of the court. Your responsibility is a grave one. As upon the manner in which you discharge your duty depends the character of government we will have. If you are a respecter of no person but let the law, like the dews of Heaven, fall equally and alike on all, visiting penalties where the law and the evidence warrant them, violation of the law will become less frequent year by year. But if the juries of the country become lax in this respect, and through lenience, or personal favoritism, overlook cases where the evidence shows wilful violations of the law beyond a reasonable doubt, and points unerringly to the parties being tried as the one who committed the infraction, crime will increase year by year. But, gentlemen, this court desires no innocent man convicted and none where there is a reasonable doubt as to guilt. In fact, gentlemen, it requires thirteen men in this court to convict a man, and if the jury should make a mistake and convict in an improper case, this court would unhesitatingly set the conviction aside. In fact, the court has done so many times in this district. I simply mention this to show you that while the court desires the law upheld and the guilty brought to justice it is far from desiring any innocent man convicted. The laws are made to protect the innocent as well as to punish the guilty."

When the court said this appellant excepted thereto upon the grounds that it was detrimental to his rights, calculated to prejudice his rights before the jury and to lead the jurors to believe that the court desired them to convict and that in case they did in an improper case, the court would thereafter protect his rights, and the jurors were, therefore, much more ready to convict than they would have been but for what the judge said to them and their belief that the court would rectify any error in convicting.

The court in allowing the bill, qualified it as follows: "That four of the jurors who heard the lecture sat upon the trial of the defendant, that the defendant did not exhaust his peremptory challenges on the panel for the week, but voluntarily accepted said four jurors when he had ample challenges to strike them and that it was not made known to the court thereafter that any objectionable juror was taken by the defendant."

In contending that this presents reversible error, appellant cites us to Jones v. State, 51 S. W. Rep., 949; Attaway v. State, 55 S. W. Rep., 45, 41 Texas Crim. Rep., 395; Chapman v. State, 57 S. W. Rep., 965, 42 Texas Crim. Rep., 135; Murphy v. State, 57 S. W. Rep., 967. We have examined those cases, and think this case and what the judge said is nothing like what was objected to and held error by the judge of the lower court in said cases.

The court in this case gave a full, complete and accurate charge submitting every issue raised and all issues that were raised in appellant's favor. There is no complaint whatever to the charge of the court. Besides this, appellant, in no way in his bill, or otherwise, shows that appellant was injured or could have been injured by what the court

said to the jury, cómplained of. The mere objections on his part, given above in his bill, by no means and in no way proved themselves. It is not shown that either of the jurors who heard the court and sat as a juror in this case on his voir dire examination or otherwise, in the slightest way indicated that what the judge said, could or did influence him against appellant in this case. He never objected to either of the jurors because of the remarks of the court or otherwise. He voluntarily accepted them, as shown by the court's qualification of his bill. This presents no error.

Appellant made no motion for a continuance. He did file a motion, however, to postpone the trial of the case for ten days to give him an opportunity to examine the list of jurors for the week for the purpose ·of determining whether he would exercise his peremptory challenges to any of the jurors. The court overruled this and in approving appellant's bill on the subject, explained the matter as follows: "The action and ruling of the court was one that applied to all parties in the court, including this defendant. From experience, the trial court had learned, Hood County being a small county, that interested parties and their friends had been in the habit of getting the jury list as soon as the same was opened, and by diligence and energy, of in some way, disqualifying all of the men on said list who were objectionable to the parties to be tried prior to the sitting of the court; and to prevent this mischief, and with the desire that men drawn by the jury commissioners should not be designedly disqualified by a defendant or his friends before court convened, and out of a desire that a fair and just jury should be had in every criminal trial, the court some years ago established the rule and has rigidly adhered to it down to and including the date of this trial, that the names of the jurors drawn by the jury commissioners should not be given out until the week for which said jurors were to perform service. The court further certifies that the jury list was delivered to counsel for the defendant immediately after the jury for the week had been empaneled by the court, and that counsel were given all the time they asked in which to investigate, confer about and pass on the various jurors on said list. Had counsel desired further time the court would certainly have granted it to them, before they were required to challenge the jurors. But they took all the time that they desired and voluntarily returned to the court their list with their peremptory challenges thereon and expressed no desire whatever for further time to investigate the panel. The court further certifies that only four jurors were procured from the regular panel, such a great number disqualified before the defendant was required to challenge. And the court further certifies that the defendant had more than enough challenges to have challenged each of said four jurors at the time his list was returned to the clerk, but he declined to do so."

Appellant's complaint was that prior to the term of the court the district judge had instructed the clerk and sheriff to permit no one to see said jury list and panel for that week until the court convened and the jury for the week was empaneled; and appellant complained that

he and his attorneys were thus deprived of seeing said list because of the action of the court and the officers in obedience thereto.

It is the policy of the law, clearly shown by the legislation on the subject and our statutes, that fair and impartial and competent jurors shall be selected to serve as jurors for every week of court and for every case that is tried. Among other things the jury commissioners who select the list of jurors for each term of court are required to do so secretly and privately, and each to take an oath that he will not knowingly elect any man as a juryman whom he believes to be unfit and not qualified; that he will not make known to anyone the name of any juryman selected and reported to the court; that he will not, directly or indirectly, converse with anyone selected as a juryman concerning the merits of any case to be tried at the term of the court for which the jurors are selected. The object and purpose of the statute in authorizing the clerk to open the envelope of the lists of jurors selected by the jury commissioners for the week ten to thirty days before court convenes is. that the sheriff shall have time to summon them, and that the jurors shall have time to arrange for their attendance. It was not intended thereby to give litigants the opportunity by themselves and their friends to tamper with the jurors who are selected. The judge, in his qualification of appellant's bill on this subject, shows a most commendable object and purpose on his part to preserve fair and impartial jurors and to prevent their being tampered with by litigants, and his action, as he shows, was caused by the necessity therefor. Besides this, his qualification of the bill shows that when appellant did get the list of the jurors he had all time and all opportunity to pass upon the jurors, to exercise his challenges which he claimed he wanted the case postponed ten days to enable him to do. No error whatever is shown in this matter.

In one ground of his motion for new trial he complained that the court erred in refusing him a new trial because of claimed newly discovered evidence. In another ground, on the claimed misconduct of the jury in commenting on appellant's failure to testify. The State contested appellant's motion on both of these grounds. The judgment of the court overruling this motion shows that the court heard evidence thereon and after doing so, overruled the motion. No statement of facts heard on the motion was filed in the court below before the court adjourned for the term. There is a bill of exceptions filed after term time purporting to show this evidence. Under a uniform and unbroken line of decisions of this court such statement, however attempted to be preserved, can not be considered unless filed before the court adjourns. See Graham v. State, 73 Texas Crim. Rep., 28, 163 S. W. Rep., 726, where some of the cases are cited. So that we can not consider this matter. Even if we could, the evidence shown by said bill positively disproves the alleged misconduct of the jury. As to the newly discovered evidence it, and the record, show that his motion and the evidence supporting it are wholly insufficient to show any error by the lower court.

Clearly he did not bring himself within the rules authorizing the court to grant a new trial on the ground of newly discovered evidence.

It is well established by the decisions of this court that a motion for new trial on this ground is closely scrutinized, and is largely confided to the discretion of the trial court; and the disposition there made of it will not be disturbed on appeal, unless it be apparent that the trial court abused his discretion to the prejudice of appellant. Burns v. State, 12 Texas Crim. App., 269; Bell v. State, 1 Texas Crim. App., 598; Templeton v. State, 5 Texas Crim. App., 398; Shaw v. State, 27 Texas, 750; West v. State, 2 Texas Crim. App., 209; Terry v. State, 3 Texas Crim. App., 236.

It is also well established that in a motion for new trial on this ground it is incumbent on the appellant to satisfy the court (1) that the evidence has come to his knowledge since the former trial; (2) that it was not owing to want of due diligence on his part that it was not discovered and did not come to his knowledge before the trial; (3) that it is competent and material evidence and not merely cumulative, corroborative, or collateral; (4) that it will probably produce a different verdict if a new trial is granted; (5) that it is not simply for the purpose of impeaching a former witness. If the application is defective in establishing any one of these essentials, a new trial should be refused. Fisher v. State, 30 Texas Crim. App., 502, 18 S. W. Rep., 90; West v. State, supra; White v. State, 10 Texas Crim. App., 167; Shaw v. State, supra; Duval v. State, 8 Texas Crim App., 370; Gross v. State, 4 Texas Crim. App., 249; Hutchinson v. State, 6 Texas Crim. App., 468.

The only other ground presented by appellant in his brief, and necessary to be considered, is shown by his bill of exception No. 4. This bill is very meager and from it this court could not possibly tell whether any error had been committed. It merely states that the State's witness Lula Beauchamp, wife of the deceased, was permitted to testify over his objections that the "reason she remained in the McGaughey home after the death of W. L. McGaughey was that the said McGaughey had willed her the property," and that he objected thereto because the same was the opinion and conclusion of the witness and not the legal and proper way of proving a valid will. The court, in approving the bill, explained it by stating, "that the defense was contending that the Beauchamps were trespassers in the McGaughey home and were doing wrong in remaining there, and this witness was permitted to testify that she remained there under a claim of right because Col. W. L. McGaughey had willed her certain interests in the property." Clearly this bill shows no error. If we could go to the statement of facts we would find that this statement by the witness was clearly admissible under the facts of this case. We deem it unnecessary to go into any extended statement of the matter to show this. It is necessary for the bill to show of and within itself such a statement of facts as to show that the testimony was not admissible, and the bill does not do this.

The judgment will be affirmed.

*Affirmed.*

DAVIDSON, Judge (dissenting).—I am of the opinion that the affirmance of this case is erroneous, and the rehearing ought to have been granted. It is unnecessary to repeat the verbal charge given the jurors before they were empaneled; it is sufficiently set out in the majority opinion. Some of those jurors tried appellant and convicted appellant. I do not purpose taking up the reasons in detail why the trial courts should not give such charges as that complained of in this case, but will discuss it in a general way. Our statute and the Constitution provide that the accused shall have a fair trial by an impartial jury. To this end it is provided as a fundamental proposition that the court shall be the judge of the law, and the jury the exclusive judges of the facts proved, credibility of the witnesses, and the weight to be given the testimony. To secure this it is expressly provided the court shall give the law of the case in a *written charge in all felonies, distinctly setting forth the law applicable to the case,* and the court is expressly prohibited from expressing any opinion on the weight of the testimony and from using any argument or statements calculated to influence the jury, or to arouse their passions. All this is either constitutional or statutory, or it may be said to be included in both. It is further provided that this charge shall be in writing and given at the time set forth in the statute, and if it is erroneous so as to injure the accused, the judgment shall be reversed, or if it appears from the record that the accused has not had a fair and impartial trial, his conviction shall be set aside. Acts Thirty-third Legislature, pages 278-279. These statutes limit the authority of the trial court, first, to giving a written charge; second, the charge must set forth plainly the law of the case; third, it must be given after the evidence is introduced and before the argument is begun; fourth, errors, if committed, will require a reversal if calculated to injure the rights of the accused or deprive him of a fair and impartial trial; fifth, it prohibits the judge from discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury (C. C. P., art. 736); sixth, it prohibits the court from giving any charge of any sort in a felony case *except in writing;* seventh, this charge must be *delivered after the evidence is introduced and before the argument is begun.* The charge given by the court as set forth in bill of exceptions, was verbal. It was given before the defendant was even placed upon his trial, and was of such a nature, if given in written charge as required by legislative enactment, it would not be permitted to stand and would necessarily operate a reversal. No lawyer would sustain this act of the court, and no appellate court would dare sanction such a charge if given the jury in his *written charge* required by the statute on the trial of the case, and yet when this charge was delivered to the jury they were not empaneled, therefore it could not possibly be legal. The court has always held otherwise until the opinion was delivered in this case and in the recent case of Reed v. State. This case is in conflict with the following cases: Jones v. State, 51 S. W. Rep., 949; Attaway v. State, 41 Texas Crim. Rep., 395; Chapman v. State, 42 Texas Crim. Rep., 135; Murphy v. State, 57 S. W. Rep., 967,

and other cases. My brethren dispose of all these cases by the simple statement that "this case and what the judge said is nothing like what was objected to and held error by the judge of the lower court in said cases." The principle involved in the cases heretofore decided and in the decision of this and the Reed case is the same. There was some difference perhaps in grounds of objection and the language used in those cases from that used in this case, but the mere difference in the language does not affect the principle involved.

Referring to the verbal charge of the trial court we find this language: "But if the juries of the country become lax in this respect, and through lenience, or personal favoritism, overlook cases where the evidence shows wilful violations of the law beyond a reasonable doubt, and points unerringly to the parties being tried as the one who committed the infraction, crime will increase year by year." Suppose this language had been given to the jury in the written charge, would there be any question of the fact that this court would reverse the judgment? No lawyer would affirm that such expressions were right and to be sustained under our constitutional and statutory law. I do not believe my brethren would hold that such language was proper in a written charge given to the jury. Again, take the expression from the verbal charge: "In fact, gentlemen, it requires thirteen men in this court to convict a man, and if the jury should make a mistake and convict in an improper case, this court would unhesitatingly set the conviction aside." It may be noted that a conviction did follow and the accused was allotted a term in the penitentiary, and under the judge's expression that "it requires thirteen men in this court to convict a man," we find that appellant has been convicted and the conviction was not set aside, I suppose upon the theory that the court believed this to be a proper case and not within the category of what he called "an improper case." He evidently did not believe this to be an improper case, but one in which a conviction should be had. My brethren have concurred with the trial court that this was not "an improper case." The jury, therefore, in the opinion of the trial court and majority of this court, did not make a mistake in the conviction, but it occurs to me that the trial court made a serious error in charging the jury verbally as he did charge and before they were empaneled to try appellant. This charge was upon matters calculated to influence the action of the jury, and especially when it tells them substantially to resolve the doubt against the accused on the theory that the court would set it aside if they made a mistake. The court did not set it aside, and if there were mistakes, he did not correct them on motion for new trial. As I understand the law, the doubt is always in favor of an accused when charged with a violation of the law, both as to the law and the facts. If there be a doubt of the facts, that doubt redounds to the benefit of the accused as does the presumption of innocence. These both are legally in his favor and fundamentally underlie our criminal jurisprudence. If there be a reasonable doubt of the facts, then there must be a doubt as to the law, or in other words, the law must be charged to fit all issues in the case, and the pre-

sumption of innocence and reasonable doubt of the facts given in charge to the jury upon every issue. This verbal charge, as I understand it, resolved all these matters against appellant. If the jury made a mistake, the court would correct it, he says. This, it occurs to me, is virtually instructing the jury in the trial of criminal cases to resolve the doubt against the accused subject to correction by the trial court if the jury made a mistake in so doing. What effect this may have had upon that jury may be speculative. It can not be told unless we infer what it was by reason of the conviction, but the charge was not the law, and was wrong. It is contrary to the statute, and calculated to and doubtless did influence the jury. Appellant was given a lengthy term in the penitentiary for murder in the second degree. This court and the trial court ought not to speculate as to results when plain violations of the statute law are shown. Various positive enactments by statute were violated by this verbal charge. The fact that the jurors were not challenged for this cause did not cure the error set forth in the verbal charge to the jury given in advance of their being empaneled in the case. Error in charges when in violation of the statutes bearing upon charges to the jury are neither waived nor cured by failure to challenge jurors. These statutes are upon a different subject and not dependent upon the statutes with reference to challenging jurors. Challenges might be interposed or sought to be interposed but that would not change nor affect the law with reference to violations of the statute in regard to charging juries.

There is one other question that I will notice. Appellant raised the question that he was entitled to inspect the veniremen summoned for the term after service upon them by the sheriff. The statute provides that not more than thirty nor less than ten days before the convening of the court the jury list shall be opened and given the sheriff, who shall summon them not less than three days before the convening of court and make his return. The judge intimates that he had been for some time protecting the purity of the jury system of the county by ordering the clerk not to permit lawyers and parties to see a list of the summoned jurors before court. I suppose the theory of the judge was that they might be tampered with or something would happen that might affect them in the discharge of their duties as jurors. The statute does not authorize this action by the court. If the Legislature saw proper to do so and thought it was necessary, doubtless they would have done so, that is, that body would have prohibited parties from getting a list of the summoned jurors, or in any way having access to them. It has been my impression of our jurisprudence as found in the statute that parties were entitled to investigate jurors who were to try them or out of whom the accused was to select a jury, in order that he might inform himself as to who were impartial. The value of this right is recognized and emphasized in the law and is thoroughly understood by the practitioners and courts. It conduces to the fair trial and impartial jury provided by the Constitution. The Legislature has made ample provision to protect jurors from being interfered with or tampered with by providing punishment against anyone who will in any way seek to

influence a juror. They who do so are subject to criminal prosecutions and for contempt of court for interfering with or trying to influence jurors. There is no charge or intimation that the accused in this case, or any of his counsel, or his friends, were trying to influence the jury or have anything to do with them. The only demand that was made by the accused was to see the list summoned by the sheriff. I make these few observations as I can not agree with my brethren in the views they have expressed on this question. Of course, if counsel for the defendant or his friends should in any way tamper with jurors, there is a provision made for their punishment. But that does not arise here, for there is no question of that sort. They simply demanded the right to get a list of the jurors in that they might prepare for trial. The view I have expressed in nowise interferes or is in conflict with the statutory enactment which requires the service of special venire in murder cases. That venire is to be served upon the defendant before his trial for a given length of time in order that he may investigate the jurors from whom he is to select a panel to try him.

There are other questions in the case, but I deem it unnecessary to discuss them. Some of them I think show error, but I do not believe this conviction ought to stand in the face of the gravity of the error on the part of the trial court in giving the verbal charge. I therefore respectfully enter my dissent.

### ADDITIONAL OPINION.

#### July 14, 1914.

PRENDERGAST, PRESIDING JUDGE.—This case was submitted for decision on February 18, 1914. At the time it was ably argued by two of appellant's eminent attorneys. They each then presented and urged the claimed errors and only those discussed and passed upon by the original opinion herein, and cited the same four cases hereinafter discussed. The full court was present and heard all this.

In addition, appellant, through his same attorneys, by their written brief, urged and presented the same claimed errors and only those, and cited said four cases.

The original opinion was considered in consultation by the full court on May 5, 1914, when it was read and the case passed upon. There was no intimation of dissent by either of the judges of this court at that time.

The original opinion was handed down the next day with the full court present. No murmur of dissent was then heard.

On May 27, 1914, the case was again resubmitted to the whole court on appellant's motion for a rehearing. It was again considered by the whole court in consultation on June 23, 1914, when it was again determined by the court that there was no error whatever in the trial of the case and that the motion for rehearing should be overruled without any written opinion. At that time, for the first time, Judge Davidson announced that he would not delay the handing down of the decision

the next day overruling the motion for rehearing, but said "some matters have been called to my attention and I desire to look into them." The decision of the court overruling the motion for rehearing without any written opinion was announced the next day in open court with a full court. For the first time, on June 24th, as this decision was announced on the motion for rehearing, we saw this endorsement on the original opinion: "The rehearing ought to be granted. Davidson, Judge." Nothing else was heard or said about the decision or the case until after this court, under the Constitution, had terminated for the term and the court had actually been adjourned for the term, which occurred Friday, June 26, just after 12 o'clock noon.

No dissenting opinion had at that time been filed and none was filed until after the court had adjourned for the term and the case had absolutely passed from the control of the court, so far as any question raised on the appeal was concerned.

In the evening of the next day, June 27, 1914, for the first time, was our attention called to the fact that a dissenting opinion had been filed. Our attention was then called thereto, and we were furnished a carbon copy thereof by one of the court stenographers.

In this dissenting opinion, after discussing only two questions that were raised and fully considered by the court when the original opinion was handed down, it is said: "There are other questions in the case, but I deem it unnecessary to discuss them. Some of them, I think, show error. . . ." If that was true, or thought to be true, it seems to us that our attention should have been called thereto before the court adjourned for the term and the case had absolutely passed beyond our control as to any question raised on the appeal. It seems to us also that in justice to the State, and especially to the appellant, should our attention have been called thereto, before the case passed beyond our control as stated.

We purposely refrained from stating the facts of this case in the original opinion. Under the circumstances we now think it advisable, if not necessary, to state the material facts. Most of them were uncontroverted. They are:

In November, 1909, Col. and Mrs. W. L. McGaughey were old and somewhat feeble,—especially Mrs. McGaughey. They were then living on their small farm of about sixty acres in the edge of the village of Tolar, in Hood County. They advertised for a housekeeper—for someone to take care of them. Appellant was their only son,—their only child. He was living at Austin, Texas, holding down a job, a clerkship, in the General Land Office. He was about forty years old and unmarried. He only occasionally visited his parents. He knew their condition. Mrs. Tucker, a young widow, with one small child and with very limited means of support, perhaps none other than her own services, saw the advertisement and got in communication with Col. McGaughey, which resulted in her going to Tolar and making arrangements with Col. and Mrs. McGaughey to stay with them,—keep house for them, do all their work, cooking, ironing, washing, etc. This was

early in November, 1909. Mrs. McGaughey was then in very feeble health and quite old. Col. McGaughey was also quite old and somewhat feeble. Mrs. McGaughey's condition continued to grow worse until in February, 1910, when she died. Prior to her death she besought Mrs. Tucker to promise to stay with and take care of Col. McGaughey after her departure until he died. Mrs. Tucker so promised the dying Mrs. McGaughey and she faithfully kept her vow.

Col. McGaughey survived until March 28, 1912, when he died. Meantime from the death of his wife he also became more feeble. Appellant knew all this, but continued to hold down his job at the Land Office, or elsewhere, only occasionally visiting Tolar.

Soon after Mrs. Tucker began·her services and devotion to Col. and Mrs. McGaughey, Mr. Hardy Beauchamp, himself a young widower with one child, wooed and won her for his bride. She, however, told him of her vow and promise to the dying Mrs. McGaughey and to Col. McGaughey to stay·with and take care of Col. McGaughey until he should likewise depart and that she would keep that vow if it went to the extent of declining to become his bride. Mr. Beauchamp did not seek to have her break her vow but instead did not press his suit further than to exact a promise from her that as soon as Col. McGaughey did depart she would at once become his bride. She faithfully, as stated, kept her vow, devoted her whole time and attention to the care and comfort of Col. McGaughey for more than two years after the death of Mrs. McGaughey, and until he died.

Col. McGaughey knew of the sacrifices and daily was·made aware of the care Mrs. Tucker gave him in response to the vow that she had made to his dying wife, and in gratitude for her devotion and sacrifices he determined, in January, 1912, before he died on March 28th following, to modestly recompense her. He thereupon executed a will by which he gave her a one-half interest in said little farm. He wrote out this will in his own hand, took it to his banker friend, Mr. Jones, in Tolar, and had Mr. Jones to typewrite it for him, making one original and two copies. He signed and acknowledged each of these three copies before his banker friend, Mr. Jones, who was also a notary public, telling him that he would keep one of the copies as the original and wanted the other two,—one for Mrs. Tucker and the other for appellant. He kept cne of these copies himself and at the time delivered the other two to Mrs. Tucker. She placed these two copies in the writing desk which had formerly been the writing desk of Mrs. McGaughey. While Col. McGaughey, two months later, was lying on his dying bed, the appellant visited him. He then heard of the will his father had made. He went to the banker and the banker told him all about it. This information, it seems, was communicated to him while Col. McGaughey was yet alive but just before he died. While his father was lying a corpse in his home and before he was interred, appellant hunted for and found these two copies of his father's will and at once took possession of them and secreted them on his person. Just after his father was interred he saw and talked to Mrs. Tucker about having heard something of a will,

but we give Mrs. Tucker's language: "John (appellant) stated that he had heard that his father had made a will and he asked me if he had, and I told him that he had and John asked me to burn them. I told him I wouldn't do it. . . . He said, 'let's burn them, they are no account.' He said he didn't know anything about them and they were no account. He said he had looked after me and would provide for me and never turn me out of home. I told him I wouldn't burn the wills. He said they were no good, he didn't know anything about it, and I told him I wouldn't burn them. John told me, in that conversation, to go get the wills, and I told him that he got them. He said he didn't know anything about them. He said Jack Hufstetler was the first one that told him about his father's making a will. I told John he had the wills, I never told him about seeing him get them. . . . John cried. I don't know what he was crying about, unless it was because I wouldn't burn the wills. John was walking up and down the hall crying—I was sitting in the room." Mrs. Tucker (Beauchamp) further testified that while Col. McGaughey was lying a corpse in his home she saw appellant go to his mother's writing desk where she had placed these two copies of the will, hunt for and find them, take them out and secrete them about his person.

Appellant's drunken witness, Jim Click, swore before the grand jury, which was taken down in writing and signed by him at the time and which he did not entirely deny on the trial of the case, that: "John said he had heard that his father had willed Mrs. B. the property but had never seen the will. He said this about the time his father died. I heard that Col. McGaughey had made a will right at the time Colonel was a corpse. John never told me he stole the will from Mrs. Beauchamp, but I may have told when I was drunk that John had told me he stole the will from Mrs. Beauchamp, or out of the desk when the Colonel was a corpse."

Mrs. Tucker (Beauchamp) further swore: "When John McGaughey asked me to burn those wills or copies of the will, he said that if I would burn them up, he would let me stay there as long as I wanted to, it didn't matter how long it was, and that he would educate the boy and give me a set of silver knives and forks, and in the fall he would give me $100, and I don't know what all. He said I could stay there as long as I wanted to. He also said he would give me a nice diamond ring. He offered me these to burn the wills. I told him I wouldn't burn them."

After Col. McGaughey had been buried Hardy Beauchamp, the deceased, then claimed of Mrs. Tucker the fulfillment of her plighted vow to him. Recognizing her vow to him and having faithfully and tenderly carried out her vow to Col. McGaughey and to his wife on her dying bed, she saw no further impediment or reason for delay in marrying Hardy Beauchamp, and she did marry him on April 3, five days after the death of Col. McGaughey. She and her husband continued to live at this McGaughey home from that time until the appellant murdered him on February 6, 1913, they claiming the right to live there

and one-half of the property by virtue of Col. McGaughey's will. Appellant kept his room there which he had kept for years, though only there occasionally. He was in. and out back and forth from time to time, as he had been in the years gone by, not staying at this home, except at intervals; but continued his employment and to hold down a job at Austin, or Dallas, or elsewhere than at Tolar. But he began to try to get possession of the whole of this little farm from the Beauchamps, becoming more persistent as the days went by. On January 3, 1913, before he murdered deceased on February 6, following, the Beauchamps began regular court proceedings to probate Col. McGaughey's will. They also brought suit at that time against appellant for a partition of said little farm, claiming one-half of it by virtue of said will. Appellant not only resisted these suits, but himself began proceedings against the Beauchamps for possession of the little sixty-acre farm. He sought in every way to get them out and to get exclusive possession himself, but failed. He tried to compromise with them, and there was some movement by both parties to this end, but the compromise was broken off just before noon, within an hour perhaps, from the time appellant murdered deceased. The compromise, it seems, was broken up and so understood by appellant just before noon when he and deceased had an interview at one of the stores in the little village of Tolar. They then separated, deceased going to the McGaughey home where his wife had prepared their dinner. Mrs. Beauchamp swore that her husband came into his dinner alone a short time before appellant came for his. Appellant still kept his room in the McGaughey home and at this time was not only sleeping there but was eating with the Beauchamps at their table. Mrs. Beauchamp had arranged, and told appellant in the morning that she was going to a church meeting in Tolar that evening early. Just after Beauchamp, deceased, had finished his dinner appellant came to the Beauchamps for his. He then claimed that he had scratched his finger in some way and asked Mrs. Beauchamp to tie it up for him, which she graciously did, deceased being present and assisting therein and furnishing a liniment which they used on his scratched finger. Mr. Beauchamp then left his room, perhaps the house,—his whereabouts are unaccounted for—for some half hour or longer until the very moment when he was murdered. Appellant again, while he was eating his dinner which she prepared and set for him, asked if she was going out as she had announced to him in the morning. She told him she was. He said to her just after he had sat down to his dinner that she ought to go to the church meeting. Just at this time he told her he wanted to see Jim Click. She swore: "He said Jim Click had two bottles of whisky and he was going down there to make him throw them away. I told him there was Jim Click and he didn't have to go down there. He holloed at Jim,—Jim was passing the gate and John holloed at him and they talked; I don't know what they said. After John talked to Jim Click he came back and sat down at the table. John said he was going to make Jim Click throw that whisky away, that he would get drunk and that he wasn't going to let him have it.

and he (John) said, 'Miss Lula, don't you think I am plotting against you, because I am not doing it,—I am not plotting against *you, Miss Lula.*' " After seeing Jim Click out at the gate at this time appellant returned and resumed his dinner. Mrs. Beauchamp, while appellant was still eating dinner, left her home and walked a half mile with a neighbor to the church meeting. Very soon after her arrival there she was informed that her husband had been killed and immediately and as rapidly as she could, returned to her home, where she found all too true that her husband had been murdered by appellant.

While appellant was out interviewing his drunken witness, Jim Click, as shown above, Emmett Sellers passed by and saw them in earnest conversation. He heard Jim Click then say to appellant, "You had better not do that." Appellant had Jim Click in his testimony on this trial to swear that at the time this conversation was had it was just after he had killed the deceased. Sellers swore it was not, and all the other facts in the case show conclusively that it was not. Sellers at the time was passing the McGaughey house, and swore, in effect, that the body of the deceased was not lying where it was afterwards, in about a half hour, found. Sellers swore that he was going beyond the McGaughey home at the time to get a cow that he had bought from Mr. Jack Hufstedler; that he rode on to Mr. Hufstedler's, wrote a check for the cow, got the cow and Mr. Hufstedler helped him to start the cow off and that they drove her from there to the McGaughey home, when they discovered the dead body of the deceased. No one was there at the time, and Mr. Sellers swore that it was not at that time that he heard Jim Click say to appellant what he said as shown above, but that it was a half hour before that, when he was passing the McGaughey place to go get the cow.

Jake Hufstedler swore that just shortly before appellant murdered the deceased, appellant was telling him about the Beauchamps claiming that his father had made a will, giving Mrs. Beauchamp one-half of said little farm, and that, in effect, they were trying to hold half of it under the will; that appellant said to him in that conversation, "That he wasn't going to stand for it; wasn't going to put up with it—he would die first." Paul Hufstedler swore that about this same time appellant, in talking to him about the Beauchamps trying to hold half of said little farm and claiming under Col. McGaughey's will, said: " 'There are people trying to beat me out of my property.' He said, 'I will die before they will beat me out of my property. . . .' He said Mr. and Mrs. Beauchamp were trying to beat him out of his property."

Guy Hufstedtler swore that just shortly before the murder of deceased appellant was talking to him. "He said he was. having some trouble about these people trying to take his estate away from him, and he said, 'It seems like I could get along all right if it was not for Beauchamp—seems like Beauchamp is the whole cause of it.' And he said, 'They are going to keep on monkeying around there till I will kill somebody.' "

Mr. J. K. Bowman, a deputy sheriff, swore that just shortly prior to the murder he was on the train with appellant; that appellant called him over to sit down by him and began talking about the Beauchamps trying to hold half of this little farm. He swore appellant said he was "having a heap of trouble with Beauchamp about the property, and he said it looked hard that he had worked hard at Austin and lived on two meals a day to pay that place out and for them to come in and set up a claim, and he said, 'If Beauchamp was out of the way I could manage Miss Lula.'" (Miss Lula referred to above was Mrs. Beauchamp.)

When said witnesses Sellers and Jake Hufstedler first found the body of deceased just after appellant had murdered him, it was shown that appellant had shot him four times,—once in the face, the ball coming out near the ear, three other wounds in his breast,—one near his right nipple, another near the left nipple, it passing entirely through his body and must have penetrated his heart. His body was found lying on a little uncovered platform extending from the house to the cistern. They found not only these pistol wounds in his body, as described by witnesses, but also, as described by the various witnesses, they found this:

Near the body of the deceased was an ax bloody all over. The ax was a chop ax, double bladed, the blade measuring ten inches from one edge to the other, weighing about five pounds, the handle about three feet in length, of hickory wood. One edge of the ax had been freshly ground. This ax was shown to have been returned by a borrowing neighbor that morning and was set down against a tree some little distance from the cistern. When found after the killing it was several feet from the body of the deceased, lying flat on the ground, with the handle towards deceased's body. After shooting the deceased as shown above and while his prostrate body was lying on said little platform, appellant put up his pistol, got the ax from the tree, went to the body of the deceased, and the witnesses swore there were four cuts on the back of the neck of the deceased with this ax. One witness said: "The first cut wound on the dead man was right about the hair of the head on the neck—it was a straight gash—cut wound about three inches deep and just the width of the ax, about four inches wide. The second wound was just back of the first wound down on the neck. That one was not probably over a half inch deep and about four inches wide. The next wound was lower down on the skin, cut,—looked like it was cut angling. That wound was very shallow and was lower down. There was another wound that hardly went through the skin. There were four cut wounds altogether on the neck."

The ax was identified, produced and introduced in evidence. Another witness swore of these ax wounds, "It looked like the licks had been struck over every time. The front part wasn't cut—it was the back part,—like a man would strike over anything. The head was not severed from the body—it lacked about two or three inches in front—I didn't examine that carefully."

Shortly before the grand jury indicted appellant in April, 1913, he interviewed said witness Sellers. Sellers swore: "I asked him why he

used that ax after he had shot Beauchamp, and he said he reckoned he was so mad that after he (Beauchamp) fell he was flopping around there and he grabbed the ax and hit him before he thought. I believe John said Beauchamp was flopping around there like a chicken with his head off and he used the ax then."

The evidence further shows that immediately after appellant had murdered deceased he got his drunken witness, Jim Click, and went with him to the little town to tell of the killing. One of the first ones, if not the first, that appellant saw after the killing was Sam Hufstedler. Hufstedler swore: "As to John's manner and appearance at that time, if I had not known of the killing I would not have suspicioned it at all—he seemed to be as cool as I ever saw him—there was nothing in his looks or manner that indicated any agitation—he was perfectly cool. He went on to the house with us in that condition."

Appellant's sole defense was self-defense which he attempted to establish by his drunken witness, Jim Click. Appellant himself did not testify.

Jim Click swore that he saw the shooting but did not see the ax transaction; that immediately after the killing, "When I met John at the gate he said, 'I killed him, but I had it to do.' John didn't tell me how he killed Beauchamp—he didn't tell me he chopped Beauchamp with the ax—John didn't say anything about the ax. All he said was, 'I killed him, Jim, but I had it to do.' He didn't go into details—he didn't make any explanation—he didn't say Beauchamp was doing anything to kill him—he didn't say Beauchamp made a threat on him— I asked him what he was going to do and he said, 'I am going to phone for Luther Waldrip, the sheriff.' Don't know whether I said anything or not. I believe I asked him what he wanted me to do, and he said, 'Come on, go with me to town.' As soon as I could unharness the mules we started to town. I met John at the gate, we came back and unharnessed the mules and we both went right on to town. When we got to town, John told me to tell Jones and Fortner."

It is true that appellant had his drunken witness, Jim Click, also to swear that he was off some distance hitching up his mules and just before the shooting he heard loud talking between appellant and deceased and that he heard appellant say to deceased, "I am going to see Jim a minute," and Beauchamp wheeled around facing John and said, "If you go out there caucusing with Click I will kill you," and he ran his hand in his pocket—"I was looking just as straight as I am looking at you now. Beauchamp and McGaughey came out on the porch. John stepped behind Beauchamp and said, 'I am going to see Jim a minute,' and Beauchamp said, 'If you go to caucusing with old Jim Click I will kill you, God damn you,' and he whirled around and McGaughey shot him and he staggered toward McGaughey, and I dropped the lines and the mules began to run, and there was a harness house right at me, and before I got the mules checked up, I was behind that, and I heard three shots and McGaughey came meeting me. Beauchamp ran his hand in his pocket—I could see it. I never saw a thing in Beauchamp's hand.

Vol. 74 Crim.-35.

I didn't see Beauchamp with an ax—I saw an ax at the cistern, and I talked to John over ten feet away from there.   I didn't see John chopping Beauchamp with the ax because the mules ran away around the house out of sight.   I never saw any ax in Beauchamp's hand.   Beauchamp didn't have the ax in his hand when he was shot—that ax was sitting by the cistern, seven or eight feet from where he fell.   Beauchamp ran his hand in his pocket—I am sure he didn't have any ax in his hand—the only thing Beauchamp did was to say what he did and run his hand in his pocket."

Jim Click further swore:   "Immediately after Beauchamp was killed I took charge of that house.   I took charge at McGaughey's request and under his instructions and before Mrs. Beauchamp got her things out of the house.   .   .   .   I didn't ask Mrs. Beauchamp's consent to move in then—I didn't ask anybody's consent—John told me by legal authority to go in there."

The jury were clearly authorized by all the evidence, to believe beyond a reasonable doubt, as they did, that Jim Click's testimony as to appellant's claimed self-defense was false; that he saw and heard nothing of the killing; that his testimony tending to show self-defense was wholly manufactured and that there was no self-defense.   The evidence as a whole also authorized the jury to believe beyond a reasonable doubt, and the preponderance of it clearly showed, that the murder was deliberately planned, coolly executed, and the body of the deceased, after he was lying prostrate on the platform, dying, if not dead, was horribly mutilated by appellant with the ax in a most brutal manner.   The wonder to us is that appellant escaped with so light and short a term in the penitentiary.

But after the adjournment of court, and after all jurisdiction of this case, as stated, had passed from this court, we are shown a dissenting opinion, filed after the term had ended, in which it is claimed, in effect, that the "speech or lecture" as designated by appellant, but as designated by the dissenting opinion, the "verbal charge" was a *charge to the jury in this case*.   We don't know how it can possibly be claimed that what the judge said to the jury panel when he organized the jury for the week, was a charge to the jury in this case.   Only four of those who heard it were afterwards selected on the jury that tried this case.   There is no intimation by this record that the other eight heard it, or ever heard that the judge had said anything to said jury panel.   The only charge the court gave the jury was the written charge in this case to which there was no shadow of objection in this or the lower court. In it he told *the jury in this case*, "You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony, *but you will receive and be governed by the law as given you in charge.   I therefore proceed to give you the law applicable to the facts of this case for your guidance."*

The dissenting opinion makes these objections to what the judge said to the jury panel—four of whom served on the jury in this case:

"These statutes limit the authority of the trial court, first, to giving

a written charge; second, the charge must set forth plainly the law of the case; third, it must be given after the evidence is introduced and before the argument is begun; fourth, errors, if committed, will require a reversal if calculated to injure the rights of the accused or deprive him of a fair and impartial trial; fifth, it prohibits the judge from discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury. (C. C. P., art. 736); sixth, it prohibits the court from giving any charge of any sort in a felony case except in writing; seventh, this charge must be delivered after the evidence is introduced and before the argument is begun." Appellant made no such objections. Below we quote his objections.

A complete and perfect answer to all this is that what the trial judge said *was not a charge of any kind or character in this case, and by no hocus pocus can it be construed to be.* Appellant, neither in the lower court, nor in this, so claimed or intimated. In the original opinion we quoted in full, word for word, what the trial judge said to the jury panel—only four of whom were on the jury in this case. We also quoted in full his qualification of appellant's bill complaining thereof. We did not then quote, but we now quote in full, word for word, the objections he made thereto:

"To which action of the court in making said speech and delivering said lecture to the jury immediately before the defendant was required to announce ready for trial the defendant then and there excepted upon the ground that said lecture was detrimental to defendant's rights and was calculated to lead the jurors for the week to believe that the court desired them to convict, and that in the event they did convict in an improper case the court would thereafter protect the rights of the defendant, and the jurors were therefore much more ready to convict than they would have been but for the said lecture, and but for belief that the court would rectify any error that they committed in convicting. And the defendant here now tenders his bill of exceptions and asks that the same be approved and filed as part of the record in this case."

As shown above, when this case was submitted, appellant's attorneys, in oral argument, claimed that this speech or lecture heard by only four of the jurors was injurious to their client and reversible error, but *not* because it was a *charge in this case. They did not claim it was a charge in this case.* They then cited in oral argument said four cases of Jones v. State, 51 S. W. Rep., 949; Attaway v. State, 41 Texas Crim. Rep., 395; Chapman v. State, 42 Texas Crim. Rep., 135, and Murphy v. State, 57 S. W. Rep., 967. They cited and relied upon these four cases in their written brief. We called attention to them in the original opinion. The dissenting opinion again cites these four cases and claims that the decision in this case, and in the case of Reed v. State, recently decided, are in conflict therewith. We said in the original opinion, and say now, that they are not in conflict herewith, and neither of them is.

We did not before give what was said by the trial judge in said four cases. Neither does the dissenting opinion; but we will now take up

each of them and show what the judge said to the jury in each. In neither of those cases is the whole of what was said by the trial judge to the jury given in full in any one of them. Different portions are given in the different opinions. But they all show that identically the same thing was said in each case by the trial judge. All of those cases were tried in the court below before the same learned, eminent and able District Judge, Wells Thompson. Evidently he had prepared in writing what he said to each of the juries in those cases and said the same thing in each.

We take the cases in the order in which they were decided. The opinion in the Jones case was written by Judge Brooks on June 7, 1899. In that case appellant was convicted for assault with intent to murder. *The court affirmed that case,—did not reverse it,* although Judge Thompson gave the same charge in that as in the three other cases. This court in that opinion unquestionably laid down the law applicable. It is: "But we desire here to emphasize what we said in Gaines v. State, 38 Texas Crim. Rep., 302, 42 S. W. Rep., 385, towit: 'However improper and indelicate such expressions as are here attributed to the judge may be, they do not of themselves afford a ground for reversal of the cause.' As was said in McCauley v. Weller, 12 Cal., 500: 'If the judge act illegally on the trial, or deny the prisoner his legal rights, this would be a cause for reversal. . . .' The most that can be said is that such conduct will cause a closer and more rigid scrutiny of the errors complained of."

We invite a reading in this connection of the Gaines case, cited by Judge Brooks. It was shown in that case that the district judge there denounced the act of Gaines, in effect, as a cold-blooded assassination, and that he should be hanged. He reiterated this to the newspapers, which published it. He at no time retracted what he said of the defendant in that case. This court in passing on that case correctly held, as stated by Judge Brooks: "However improper and indelicate such expressions as are here attributed to the judge may be, they do not of themselves afford a ground for the reversal of the cause."

The next case decided was the Attaway case, on January 17, 1900. The opinion was by Judge Henderson. He expressly held that the address of Judge Thompson to the jury was not reversible error and reversed the case on another entirely distinct and separate ground. The other two judges, however, said that the case ought also to be reversed on what Judge Thompson had said.

The other two cases, Murphy and Chapman, were decided on the same day. Judge Brooks wrote the opinion in the former and Judge Davidson in the latter. *Judge Henderson vigorously dissented in both.*

But let us see what Judge Thompson did say to the jury in each of said four cases. We will not copy all of it, but will copy enough and the material parts, so as to conclusively show, as we said in the original opinion herein, that what he said to the juries in those cases is nothing like what is complained of as what Judge Oxford said to the jury panel

in this case.  What Judge Thompson said to the jury in each of those cases was this:

(We take this quotation from the Jones case.)  "I want to call your attention to the law of reasonable doubt, what is frequently urged as defense for crime, and which will be urged in most, if not all, cases that will come before you while you are the jury for this week.  I will give you this charge upon these subjects here now, because the law restricts me from giving it to you in the particular cases that arise as they arise.  What is meant by reasonable doubt is not any mere supposition, but is one that arises and is founded upon the evidence of the case.  Shrewd lawyers urge and represent to jurors in the trial of cases that, if there is any doubt in the case, the defendant should be acquitted, and urge the old saying that it is better that ninety and nine guilty men go free than one innocent man be convicted, and upon this doctrine, and upon the unreasonable extension of the defense of reasonable doubt, thousands of criminals have been turned loose upon society in Texas. I don't think I ever saw an innocent man convicted.  We hear of them now and then way off, but, like the bag of gold at the end of the rainbow, when we approach they vanish.  Now, I believe, and I think every right thinking man thinks with me, that it is better that an innocent man be convicted now and then than that ninety-nine bloody murderers, burglars, and robbers be turned loose upon the country.  This doctrine of reasonable doubt, as urged by shrewd lawyers in this State, has no application, and should have no weight with jurors.  Our laws are intended for the protection of society, and, while they do not aim in any instance at the conviction or punishment of the innocent, yet it is of the highest importance to you and me that the guilty do not escape through the influence of such sophistry as I have called your attention to, which, in the great majority of cases, when urged as a defense, is like the famous hip-pocket defense in homicide, to which I will call your attention,—is a manufactured and fictitious defense; and, whenever the jurors see such defenses raised to shield the guilty criminal, it is not only their duty, as the judges of the fact, to disregard it, but to disregard it altogether.  If the innocent man is convicted he can appeal to the higher courts, and get his case righted.  By reasonable doubt is not meant an ordinary doubt, not any small doubt, but a doubt arising out of all the testimony.  I charge you to recollect these matters, and be guided by these general instructions in the trial of each and every case that shall be submitted to you in which such matters will arise, and hope that your conduct as jurors will conform to them; and if you, as jurors, are guilty of any improper conduct, I will give you notice right now that the one or ones so guilty will be fined not less than one hundred dollars, and the one so fined will not get it remitted."

(We take this quotation from the Chapman case.)  "There is a defense for murder that is put in evidence in almost every case that is now tried, until the law-abiding citizen has become alarmed.  It is the hip-pocket defense, by which the murderer seeks to justify under the law of self-defense.  It has received its sanction in those cases which

lay down the rule that the jury must judge the defendant's case from his own standpoint; that they must put themselves in his shoes, and look at his adversary just as he appeared to the defendant himself at the time he fired the fatal shot, and if the deceased made any demonstration, such as throwing his hands behind him, which reasonably appeared to defendant that his life was in danger, or that he was in danger of serious bodily injury, and defendant then killed deceased, that he would be justified under the law of self-defense. There may be something in the abstract theory thus laid down, and there might possibly arise such a case wherein a party might be justified, although deceased was unarmed. But a person ought not to make any mistake or error in regard to the meaning of such demonstrations or movements of his adversary. In nearly every case the defendant or his friends testify that the deceased threw his hands behind him, and this bare fact seems to be enough to cause juries to rush with jubilant feet to the rescue of the murderer. . . . Now, as you jurors are the exclusive judges of the credibility of witnesses, it is for you to say that when a defendant has murdered a helpless, unarmed man, and he offers proof, by himself or his friends, that although the deceased had no weapons himself, and although he knew that the defendant was himself armed, yet he (deceased) actually threw his hands behind him as if to draw a pistol, which he did not have and never had, and advanced on the armed defendant to certain death,—it is for you to say whether or not such testimony is true or false. If I was a juror, I should, without hesitation, say that such testimony was manufactured, and I should promptly disregard it."

In the original opinion herein, as stated, we quoted literally and fully everything that Judge Oxford said to the jury panel for the week. We invite a reading of it, just in this connection. How it is possible for *anyone* to claim that the language of Judge Oxford in this case is anything like the language of Judge Thompson in the other cases, we are incapable of comprehending. We think no reasonable man, whether he be "lawyer," judge, juryman, or citizen, could for one moment believe, think or imagine, that the language is substantially, or otherwise, the same, or that the principle which would apply to one could apply to the other.

We do not desire to discuss this question further. A mere statement of the matters and a reading of the opinions are all that could be even desired.

Besides this, even if by any kind of mental gymnastics the jury panel—only four of them were on the jury in this case—could have considered what the judge said to them was a charge *in this case,* then we are peremptorily commanded not to reverse the cause on account of the language of the district judge; for article 743, C. C. P., as amended in 1913, expressly commands, *"the judgment shall not be reversed,* unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." We obeyed this command.

We could not have done otherwise. We think no one, whether he be "lawyer," judge, or citizen, can read this record and come to any other conclusion, or even have it suggested thereby that appellant did not have a fair and impartial trial, or that any error was committed therein which was calculated in the slightest degree to injure his rights.

As to the other complaint in the dissenting opinion 'that the trial judge had no right to deprive appellant and his friends of the privilege of seeing the jury list before the court convened so that he, or they, could tamper with the jurors and "fix" them, or where they were not wanted by him, to disqualify them, we have but little to say. We have been taught to believe, and do believe, that *prevention is better than punishment.* Our Supreme Court and this court have, in effect, many times said: "Prevention of crime is one of the objects to which the most anxious thoughts and the most constant efforts of thoughtful legislators are directed, and the dealing with the steps preparatory to commission is a favorite method. Our codes are full of instances of this too numerous and too familiar to need citation." Dupree v. State, 102 Texas, 455; Ex parte Allison, 99 Texas, 455.

The suggestion, as we understand it, of the dissenting opinion, that the court ought to have permitted the appellant and his friends to have the opportunity to "tamper" with and "fix" the jurors, and thereby acquit him of a most heinous crime, of which there can be no shadow of doubt of his committing, and then forsooth punish him, or his friends, in contempt proceedings by fine of $100 and confinement three days in jail, or any other punishment for the "jury fixer," does not meet with our approval. Instead, we again commend the action of Judge Oxford in preventing these crimes, and in securing a fair and impartial jury, and one that had not been tampered with, nor fixed in advance. Surely what Judge Oxford did and said in this respect, as shown by appellant's bill, must have been overlooked. There is no shadow of error on this point shown by the record in this case. On the contrary, the very reverse of this is true. By no statute or other law are our trial judges prohibited from *preventing* the jury "fixer" from getting in his infamous work. On the contrary, the whole trend of our legislation and "jurisprudence" makes it the duty of trial judges to *prevent* the "jury fixers" tampering with the jurors.

We have again carefully reviewed the whole record of this case and are of the opinion that no error whatever was committed in the trial that could possibly be even an excuse for this court to reverse this cause, and we are more than satisfied with the affirmance of it as shown in the original opinion.

*Affirmed.*